BRIAN JOHNSON, Plaintiff-Appellant, v. GROSSINGER MOTORCORP, INC., Defendant-Appellee.

First District (2nd Division)    No. 1—00—3347

Opinion filed June 29, 2001.

Christopher V. Langone, Joel D. Dabisch, and Mark T. Lavery, all of Langone Law Firm, of Chicago, for appellant.

John J. Kohnke and Paul E. Wojcicki, both of Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

In September 1998, plaintiff filed a nine-count complaint against

Grossinger Motorcorp, Inc. (Grossinger or defendant). Count I was dismissed. Defendant's motion for summary judgment as to counts II, III, VI, VII, VIII, and IX was granted. Defendant's motion for summary judgment as to counts IV and V was denied. Plaintiff later voluntarily dismissed counts IV and V. Plaintiff now appeals from the order granting defendant's motion for summary judgment as to counts II, III, VI, VII, VIII, and IX of plaintiff's complaint.

The issues upon appeal are: (1) whether the trial court erred in granting summary judgment in favor of defendant relating to plaintiff's conversion claim; (2) whether the trial court erred in granting summary judgment in favor of defendant relating to plaintiff's wrongful repossession claim; (3) whether the trial court erred in granting summary judgment in favor of defendant relating to plaintiff's claim under the Truth in Lending Act (TILA) (15 U.S.C. § 1601 *et seq.* (1994)); and (4) whether the lower court erred in granting summary judgment in favor of defendant relating to the plaintiff's Equal Credit Opportunity Act (ECOA) claim (15 U.S.C. § 1691 *et seq.* (1994)).

We affirm.

## BACKGROUND

On April 27, 1998, plaintiff went to Grossinger Motorcorp Inc., to purchase a vehicle. Plaintiff spoke to "Mark J." of Grossinger and informed him that he was interested in purchasing a car for under $12,000. Mark showed plaintiff a Chevy Blazer. After test-driving the Blazer, plaintiff spoke with Jim Wagner, the finance manager at Grossinger. Plaintiff asserts that Jim talked him into buying the Blazer even though it was above his price range, drew up the contract, and "signed everything." It was plaintiff's understanding that he was given conditional financing provided that he present certain documentation. The next day, plaintiff returned the Blazer pursuant to Grossinger's 36-hour exchange policy because "[t]he price range was too steep."

On April 28, 1998, plaintiff test-drove a 1992 Crown Victoria. After the test-drive, plaintiff decided to buy the car. He signed a promissory note for the $250 down payment, signed a "Retail Installment Contract," initialed the accompanying "Rider to Purchase Contract/Lease Contract" (Rider), and left with the Crown Victoria. Plaintiff traded in a vehicle which still had $600 in payments left on it. Approximately two days later, plaintiff returned to the dealership to retrieve the in-dash radio from his trade-in vehicle.

The "Retail Installment Contract" provides that the cash price of the Crown Victoria was $8,106.69, less the $250 down payment, less the $2,600 trade-in, leaving an unpaid balance of $5,256.69. Beginning

on May 27, 1998, plaintiff was expected to pay 41 installments of $230.18 each to the order of Grossinger at the offices of a bank in Evanston, Illinois. The Rider provides, in pertinent part:

> "The customer understands and agrees that Grossinger shall not be obligated to sell unless a third party agrees to purchase the motor vehicle retail installment contract signed by the customer with the purchase contract and this rider. Customer agrees to *reasonably cooperate* in obtaining such third party approval including but not limited credit application. *The purchase contract and retail installment contract may be canceled at any time by Grossinger, if Grossinger determines that it cannot obtain third party approval* and may be canceled by either party within 21 days if third party approval is not obtained on the agreed terms.
>
> ***
>
> Customer agrees to return the vehicle within twenty-four hours of notice that Grossinger has not obtained third party approval and Grossinger agrees to return any down payment or trade-in by the customer. Grossinger may repossess the vehicle, with or without legal process, if customer refuses to return it within twenty-four hours." (Emphasis added.)

During his deposition, plaintiff testified that it was his understanding that he could not leave the dealership until financing had been secured and, therefore, he assumed that he had financing when he left Grossinger with the Crown Victoria. He also understood that defendant could cancel the contract if it could not secure financing for him and that it was his obligation to provide it with the necessary paperwork to secure such financing. He recalled that some of the paperwork needed was a list of references, a postmarked piece of mail, a utility bill, and a paycheck stub.

A few days after the purchase of the Crown Victoria, plaintiff returned with proof of insurance and $250 cash. Plaintiff recalled that he was supposed to bring in the paperwork requested by the manager when he brought in the cash. Although plaintiff was not positive that he brought in all of the paperwork, he thought he "had all of the necessary paperwork." He stated that he did not make a copy of the documents that he provided that day. Jim said, "[L]ook, this should work but call back." Plaintiff told Jim that he would call back to "make sure everything was okay." A day or two later, plaintiff called Jim "to make sure the paperwork was in order." Jim told him "so far so good."

About 20 days later, plaintiff went to the dealership because he had not received a payment book. Plaintiff asserts that during that visit, he paid $230.18 as his first installment payment and he was given a receipt. However, the receipt has not been produced.

Approximately 30 days after plaintiff took possession of the Crown

Victoria, while he was at his place of employment, a coworker informed him that someone was "messing with" his car. When plaintiff and three other coworkers went to the parking lot, he discovered a man lifting the vehicle with a tow truck. Plaintiff stated that he asked him what he was doing and the man responded that "he had paperwork to repossess the car." Plaintiff asked him where he acquired that paperwork, but the man did not respond. The man continued to lift the car and plaintiff told him "[W]ait a minute. Let me call Grossinger." Despite plaintiff's protest, the vehicle was towed away.

Plaintiff called Mark at Grossinger. Mark told plaintiff that he tried calling plaintiff a few times because he needed him to bring in more paperwork. Plaintiff told him that he would bring the paperwork after work. Plaintiff testified that Mark said to him, "[T]hey'll continue to repossess the car. Just bring in the paperwork, and the car will be ready." Plaintiff asked Mark if he could just drive the car to the dealership and take care of the paperwork then. Mark stated, "[D]on't worry about it. We'll just redo the whole contract."

Plaintiff testified that he brought with him the same paperwork he had provided to Grossinger on at least two previous occasions, which included a utility bill, references, his driver's license, and mail from his employer. When plaintiff arrived at the dealership, Mark was occupied. After waiting for an hour and a half, plaintiff told an unnamed manager that the repossessor damaged the vehicle and he should take $200 off of the purchase price. The manager said no. Plaintiff also told the manager that the Grossinger customer service was bad and that he just wanted his trade-in back. The manager stated no, so plaintiff asked again. The manager told plaintiff that the car was being put on hold because he owed $600 toward the purchase. Plaintiff told him that he could not do that. Then the manager informed plaintiff that the car had been sold and to have his lawyer call him. Plaintiff then told the manager that he was tired of waiting and that he wanted to terminate the entire deal.

Plaintiff testified that his $250 down payment and his trade-in vehicle have not been returned. Plaintiff also asserts that the $600 balance on the trade-in was never paid and is now delinquent. After the repossession, plaintiff's mother told him that Mark called him on one occasion. Plaintiff recalled receiving a letter from General Motors Acceptance Corporation stating that his financing application for the Blazer had been denied. He stated that he never received a letter indicating that he had been denied financing for the Crown Victoria. Plaintiff asserts that he had no contact with Grossinger between the date of his first installment payment in May 1998 and the repossession.

Charles Settles, Jr., testified that 99% of the time, people leave with possession of a vehicle even though financing has not been obtained. Settles also testified that Grossinger arranges financing for more than 150 car deals a year. He stated that plaintiff's situation was a "very, very unusual case" because "he didn't cooperate with us in order to acquire him financing *** he didn't give us the documentation." Settles testified that Community Credit issued a "qualified denial" indicating that if plaintiff had a parent cosign, he could have been financed through them. Settles also stated that Grossinger did not send a letter to plaintiff indicating that Grossinger had applied to Community Credit on his behalf or that he was denied financing due to minimal income and derogatory credit or that Community Credit would consider him if he secured a parent cosignor. Settles stated that Grossinger did not send plaintiff such a letter because it was his understanding that it was the "banking institution's" duty to do so.

The affidavit of James Wagner, the finance director for Grossinger at the time of plaintiff's purchase, provides: on or about the date of purchase, plaintiff stated that he understood that he had been conditionally accepted for financing by Long Beach Acceptance Corporation (Long Beach); plaintiff was provided a list of the material required by Long Beach; plaintiff "never provided all the documentation requested" by Long Beach; various personnel, including Wagner, specifically advised plaintiff that Long Beach needed the requested documentation prior to approving the third-party financing; and plaintiff did not make any payments to Grossinger or any other Grossinger entity pursuant to the installment contract in furtherance of the purchase of the Crown Victoria.

The affidavit of Robert Dean, the current finance director for Grossinger, provides: Grossinger actively sought third-party financing from four financial institutions relative to the Crown Victoria; despite numerous attempts to contact plaintiff at work and at home, plaintiff failed to provide the documentation required by Long Beach to approve his loan; third-party approval was not obtained; and Grossinger made no attempt to solicit any additional funds from plaintiff nor did it attempt to enter into any subsequent agreement of different terms than originally agreed upon relating to the Crown Victoria.

Robert Dean's second affidavit provides: he was not aware of any documentation in the possession of Grossinger that indicates that plaintiff made any payments to Grossinger in furtherance of the retail installment contract; plaintiff did not make any payments to Grossinger in furtherance of the retail installment contract; Grossinger paid the outstanding loan balance on plaintiff's trade-in after plaintiff promised to provide Long Beach with the requested documents for

loan approval; and Grossinger had no involvement with Long Beach's decision to accept plaintiff's loan application on a conditional basis.

In September 1998, plaintiff filed a complaint against Grossinger Motorcorp, Inc. The complaint provides that the amount in controversy exceeds $50,000 based on the statutory, actual, and punitive damages alleged in counts II though IX.

Count I of the complaint alleges that defendant violated sections 10a(f), (g), and (h) of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a(f), (g), (h) (West 1998)) and violated article IV, section 13, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 13).

Count II alleges that Grossinger engaged in unfair or deceptive conduct in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 1998)) in that it misled plaintiff by telling him that it would attempt to obtain financing for plaintiff when Grossinger "did not make any applications to lenders" and Grossinger represented to plaintiff that it would pay off the remaining $600 owed by plaintiff on the Lincoln Town Car which Johnson traded in. The complaint alleges that Grossinger refused to extend credit to plaintiff and did not return any part of plaintiff's down payment for the Crown Victoria.

Count III alleges that Grossinger obtained unauthorized and wrongful assumption of control over the Crown Victoria when it repossessed the vehicle.

Count IV alleges that defendant obtained unauthorized and wrongful assumption of control over plaintiff's Lincoln Town Car when defendant sold the Lincoln Town Car.

Count V alleges that if defendant is allowed to retain the benefits of plaintiff's $250 down payment, defendant will be unjustly enriched.

Count VI alleges that in failing to accurately disclose the annual percentage rate on the Crown Victoria purchase, defendant has violated the Truth in Lending Act (15 U.S.C. 1601 *et seq.* (1994)).

Count VII alleges that defendant violated the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et seq.* (1994)) by failing to notify plaintiff in writing that his application for financing the Crown Victoria had been denied.

Count VIII alleges that the repossession of the Crown Victoria constitutes a violation of the Fair Debt Collection Practices Act (15 U.S.C. § 1692a(6)(A) (1994)).

Count IX alleges that defendant unlawfully repossessed the Crown Victoria from defendant's place of employment without providing notice of the repossession and breached the peace during the repossession.

In December 1998, defendant filed a motion to dismiss, alleging that: (1) counts I and II of plaintiff's complaint have failed to comply with the section 10a(h) of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a(h) (West 1998)), by failing to serve a written notice of the nature of the alleged violation and demand for relief upon Grossinger; (2) plaintiff's complaint fails to set forth sufficient facts to support the conversion and unjust enrichment allegations; and (3) plaintiff's complaint fails to allege sufficient facts to support those allegations set forth in counts VI, VII, and VIII to state a cause of action.

In February 1999, plaintiff filed a motion in opposition to defendant's motion to dismiss. In April 1999, the defendant's motion to dismiss was granted as to count I "without prejudice to bring a motion for summary judgment." Also, as to count I, the court explicitly stated that "this is a final and appealable order and there is no just reason to delay enforcement or appeal pursuant to Supreme Court Rule 304 [(134 Ill. 2d R. 304)]." In March 2000, the defendant filed a motion for summary judgment of the remaining counts. In May 2000, defendant filed its amended affirmative defenses.

In an order dated June 27, 2000, defendant's motion for summary judgment was granted as to counts II, III, VI, VII, VIII, and IX; defendant's motion for summary judgment for counts IV and V was denied; the court stated that it lacked jurisdiction over count II; and plaintiff's cross-motion for summary judgment was denied.

On September 8, 2000, the plaintiff filed a motion for voluntary dismissal without prejudice for counts IV and V. Plaintiff's motion for voluntary dismissal was granted without prejudice and the arbitration date of October 11, 2000, was stricken.

On September 27, 2000, the plaintiff filed a notice of appeal "pursuant to Illinois Supreme Court Rule 303 [(155 Ill. 2d R. 303)]" from the June 27, 2000, order. In December 2000, defendant filed a motion to dismiss the appeal. In January 2001, the defendant's motion to dismiss was denied.

## ANALYSIS

### Standard of Review·

•1 A circuit court's grant of summary judgment is reviewed *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Purtill v. Hess*, 111 Ill. 2d 229, 240-44, 489 N.E.2d 867 (1986).

## I

●2 We commence our analysis by addressing whether we have jurisdiction to hear this matter upon appeal. The defendant "contests this court's jurisdiction under Supreme Court Rule 303 as the June 27, 2000[,] interlocutory order did not become a final order when plaintiff voluntarily non-suited his case. Also, plaintiff can not [*sic*] seek appellate review of the September 8, 2000[,] order seeking to vacate the non-suit order." It is our view that we have jurisdiction to adjudicate this matter. It is well settled that final orders entered in a case become appealable following a voluntary dismissal. *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 503, 687 N.E.2d 871 (1997).

We find the *Dubina* case instructive. In *Dubina*, the issue on appeal was whether the defendant could appeal certain final orders entered in a suit that was voluntarily dismissed where the action was later refiled in the circuit court. The Illinois Supreme Court stated that without a Rule 304(a) finding, a final order disposing of fewer than all of the claims in an action is not instantly appealable. *Dubina*, 178 Ill. 2d at 502-03. However, the original and refiled actions in *Dubina* were distinct actions and when the original action was terminated, the circuit court lost jurisdiction of the original action and all final orders became appealable under Rule 301. *Dubina*, 178 Ill. 2d at 504. The court held that, "The order of voluntary dismissal, because it disposed of all matters pending before the circuit court, rendered all orders which were final in nature, but which were not previously appealable, immediately final and appealable." *Dubina*, 178 Ill. 2d at 503. See *Valdovinos v. Luna-Manalac Medical Center, Ltd.*, 307 Ill. App. 3d 528, 718 N.E.2d 612 (1999).

In light of the holding in *Dubina*, we hold that we have jurisdiction over the instant appeal.

## II

Plaintiff contends that a question of fact exists as to his claim for conversion of the Crown Victoria. Defendant responds that the plaintiff cannot establish a *prima facie* case of conversion. We agree with the defendant.

●3 To prove conversion, a plaintiff must establish that: (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67 (1998).

●4 Plaintiff in the instant case avers that he has "an absolute and

unconditional right to possession of the vehicle because defendant waived any financing contingency" by representing to plaintiff that financing had been obtained and by selling Johnson's trade-in. Plaintiff does not provide any authority to support this contention. The "financing contingency" of the Rider was not waived by the defendant. The fact that plaintiff's trade-in was sold soon after plaintiff signed the contract and Rider is irrelevant as to whether third-party financing had been secured. Moreover, plaintiff testified that he understood that, pursuant to the Rider, the deal would be canceled if third-party financing could not be obtained.

Plaintiff contends that his right to possession was absolute and unconditional since he was not in default or late in his payments. Plaintiff asserts that he did pay and the receipt for that payment was in the vehicle when it was repossessed. The affidavits and depositions submitted by the parties refute plaintiff's claims.

The affidavit of James Wagner, who had been finance director for Grossinger, stated in pertinent part:

"5. On or after April 27, 1998, Mr. Johnson stated that he understood that he had been conditionally accepted for financing by the Long Beach Acceptance Corporation, conditioned expressly upon his providing certain documentation required by the Long beach Acceptance Corporation. Mr. Johnson was provided a list of the material required by the Long Beach Acceptance Corporation.

6. That Brian Johnson never provided all the documentation requested by the Long Beach Acceptance Corporation. Mr. Johnson failed to provide the necessary documentation as requested by the Long Beach Acceptance Corporation despite numerous attempts by various personnel, including myself to Mr. Johnson to provide the documentation. *** Despite Mr. Johnson's promise to obtain said documentation he never provided the documentation as requested by the Long Beach Acceptance Corporation.

7. Brian Johnson did not make any payments to Grossinger Motor Corp., Inc., or any other Grossinger entity pursuant to the Retail Installment contract. Mr. Johnson made no payments to Grossinger Motor Corp., Inc., in furtherance of the purchase for the Crown Victoria."

The affidavit of Robert Dean, finance director for Grossinger after Mr. Wagner, stated in pertinent part:

"1. *** I have had the opportunity to give a deposition in this lawsuit as well as an opportunity to review any and all documents contained in the deal jacket relating to the attempted sale of the Crown Victoria complained of by Brian Johnson in his Complaint. ***

3. That based upon my own personal knowledge and a review of

the aforementioned documents, Brian Johnson did not make any payments to Grossinger Motor Corp., Inc. pursuant to the Retail Installment Contract.
\*\*\*

5. That Grossinger Motor Corp., Inc. had no involvement with Long Beach Acceptance Corporation's decision to accept Brian Johnson's loan application on a conditional basis."

The affidavits and depositions considered by the trial court establish that no triable issue of fact exists as to plaintiff's claim for conversion of the Crown Victoria. Accordingly, the trial court properly granted summary judgment in favor of defendant on the conversion issue.

Plaintiff also asserts that Grossinger had no interest in the vehicle. However, defendant retained the title to the Crown Victoria and, therefore, had a security interest in it. See *Ambre v. Joe Madden Ford*, 881 F. Supp. 1182, 1185 (N.D. Ill. 1995). Plaintiff did not hold title to the Crown Victoria and the only interest he had in the vehicle was possessory, which was based upon his promise to provide the necessary documentation in order to secure third-party financing.

Accordingly, the trial court's grant of summary judgment against plaintiff's conversion claim is affirmed.

### III

Plaintiff next contends that Grossinger unlawfully repossessed the Crown Victoria and a question of fact exists as to whether the repossession of the vehicle involved a breach of the peace.

•5 Section 9—503 of the Illinois Uniform Commercial Code provides: "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." 810 ILCS 5/9—503 (West 1998).

In the instant case, the parties agreed that if third-party financing could not be obtained, the transaction may be canceled by Grossinger. Grossinger had an interest in the vehicle which entitled it to repossess the car, without judicial process if it could be done without a breach of the peace, when third-party financing had not been secured on plaintiff's behalf.

The term "breach of the peace" connotes conduct that incites or is likely to incite immediate public turbulence, or that leads to or is likely to lead to an immediate loss of public order and tranquility. *Chrysler Credit Corp. v. Koontz*, 277 Ill. App. 3d 1078, 661 N.E.2d 1171 (1996). The probability of violence at the time immediately prior to the repossession is an element in determining whether a breach of the peace has occurred. *Koontz*, 277 Ill. App. 3d at 1082.

Here, there is no issue of fact as to whether defendant is liable for breaching the peace or whether there was a probability of violence at the time immediately prior to the repossession. Plaintiff testified that he voiced an objection to the repossession of the vehicle, but the agent continued towing the vehicle. Plaintiff has not asserted any facts that indicate that this was anything more than a peaceful repossession.

●6 Plaintiff notes that other jurisdictions, with statutes similar to section 9—503, have held that the duty to avoid breaching the peace when repossessing secured collateral is a nondelegable duty. No Illinois cases have affirmatively addressed whether avoiding breaching the peace is a delegable duty, and we decline to address it in this case. The general rule in Illinois, however, is that a principal is not responsible for the acts of his independent contractor unless the act causing the injury was committed at the direction of the principal or the principal failed to use reasonable care in the selection of the independent contractor. *Jones v. Beker*, 260 Ill. App. 3d 481, 485, 632 N.E.2d 273 (1994). Even if we were to hold that the Illinois statute creates a nondelegable duty on the creditor to refrain from breaching the peace when repossessing secured collateral, and, therefore, the creditor is liable for any breach of the peace by the independent contractor, there have been no facts alleged in the instant case that would indicate that the actions taken during the repossession resulted in an actual or possible breach of the peace.

Accordingly, the trial court properly granted summary judgment in favor of defendant on the wrongful repossession and breach of the peace issues.

## IV

●7 Plaintiff's next contention is that the representations made by defendant's agent that financing had been obtained when plaintiff took possession of the Crown Victoria, when in fact it had not and plaintiff did not have use of the financed amount, was a violation of the Truth in Lending Act (15 U.S.C. § 1601 *et seq.* (1994)).

Under TILA, a creditor must disclose "the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2)(A) (1994). Plaintiff posits that the annual percentage rate and finance charges were not accurately disclosed on the contract because defendant did not extend credit on the date of the contract signing. Defendant responds that there is no genuine issue of material fact that the retail installment contract was never completed due to plaintiff's failure to provide necessary documentation.

Plaintiff relies on *Rayburn v. Car Credit Center Corp.*, No. 00 C 3361 (N.D. Ill. 2000). The *Rayburn* court held that there existed a

question of fact as to whether the amount financed set forth in the contract was the correct amount in light of the down payment actually paid. *Rayburn*, slip op. at 2. In that case, unlike the instant case, the retail installment contract failed to reflect the amount financed based on the actual $2,000 down payment remitted by Rayburn. No dispute exists in the instant case regarding the correctness of the down payment.

Accordingly, the trial court's grant of summary judgment on the claimed TILA violation is affirmed.

## V

In count VII of his complaint, plaintiff contends that defendant is a creditor within the meaning of the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et seq.* (1994)), and, as such, had an obligation to notify plaintiff in writing that his application for financing from Long Beach had been denied. Plaintiff argues that *Williams v. Thomas Pontiac*, No. 99 C 882 (N.D. Ill. 1999), is an apposite case. In opposition, defendant argues that the trial court's decision should be affirmed since plaintiff's application for financing to Long Beach was conditionally accepted, but was subject to plaintiff completing requisite documentation to obtain third-party financing. Defendant further contends that it is not a creditor as defined by the ECOA.

In *Williams*, the plaintiff, Michelle Williams, had been denied credit and received a statement from Thomas Pontiac, the defendant, that her credit application had been denied. However, the statement failed to list the reasons for the refusal. *Williams*, slip op. at 12. Thomas Pontiac contended that it was not a creditor making a decision. In *Williams*, the court held that Williams had provided sufficient evidence to raise a genuine issue of fact as to whether Thomas Pontiac was a creditor.

●8 For reasons stated in *Williams*, we do not agree with defendant's contention that no issue exists as to whether Grossinger is a creditor as defined by the ECOA. Section 1691(a) of the ECOA defines a creditor as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e) (1994). The regulations state that a creditor includes "a creditor's assignee, transferee, or subrogee who participates in the decision of whether or not to extend credit." 12 C.F.R. § 202.2(l) (1998). Moreover, the regulations also state that a creditor can also include "a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to

select creditors to whom requests for credit may be made." 12 C.F.R. § 202.2(l) (1998). However, whether there is a factual issue as to whether Grossinger was a creditor in the instant case does not preclude the grant of summary judgment in the instant case.

In the instant case, Long Beach provided conditional loan approval subject to certain documents being provided. Affidavits submitted established that plaintiff had been furnished by Grossinger with a written list of the material required by Long Beach. Plaintiff testified that he was aware he had received conditional financing from Long Beach and that various documents were required by Long Beach in order to secure financing. The affidavits established that plaintiff provided some, but not all, of the requested documents that he had promised to provide. The car was repossessed approximately 30 days after the application because plaintiff had not furnished documentation. After the repossession, plaintiff withdrew his application. Because plaintiff failed to complete the documentation requested in writing in order to complete the application, we hold that the trial court did not err in granting summary judgment on the ECOA count.

For the foregoing reasons, the trial court's order granting summary judgment is affirmed on all counts.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.