ON APPLICATION FOR REHEARING
Our opinion of January 10, 1992, is withdrawn and the following is substituted therefor.
Willie Madden appeals from a summary judgment in favor of the defendants, Deere Credit Services, Inc. ("Deere"), and Rodney Warrick, in Madden's claim alleging conversion of an implement used in his logging business. We reverse and remand.
In June 1987, Mr. Madden was engaged in the business of cutting timber. On June 17, 1987, he purchased from Mid South Machinery Company, Inc., a "used cable skidder," an implement for use in his timber-cutting operation. He paid $8,971.10 of the purchase price and signed a note for the balance, which was secured by an agreement giving Deere an interest in the skidder. Under the note, a payment of $1,245.33 was due on July 20, 1987, and on the 20th day of 17 consecutive months thereafter.
Madden concedes that his payments on the note were made "on an irregular basis" and that he "was past due on monthly payments according to Deere records in the latter part of November 1988." Brief of Appellant, at 3. Indeed, Deere's "statement of account" shows that no payments were received during the months of September and October 1987 and May, August, and October 1988. Moreover, the payment received on July 7, 1988, was made by a check that was subsequently returned unpaid because of insufficient funds.
In early December 1988, Rodney Warrick, an "area collection manager" for Deere, visited Mr. Madden at his house regarding the delinquent account. The purpose of the visit, according to the defendants, was to collect $5,376.41, the amount of principal and interest that was overdue on the note. As evidence of the delinquency, the appellees contend, Warrick carried an "SAS" sheet, which contained only the names and addresses of customers and the *Page 862 
amounts that were past due on each account. Madden informed Warrick that he had recently mailed a check to Deere in the amount of $3,000. He then tendered an additional check in the amount of $2,401.41.[1] This $2,401.41 check carried the notation "paid in full."
Following the two payments made in December 1988, Madden, according to Deere's records, owed $1,309.37. After a number of unsuccessful attempts to collect the balance, Warrick met with Madden in the first week of August 1989. Again, Warrick was unable to collect the delinquent amount.[2]
At the August meeting, Warrick asked to see the skidder. The following morning, Madden took Warrick to view the skidder at the site of his logging operation, which was on property owned by Container Corporation ("Container"). Several days later, at approximately 10:00 p.m. on the night of August 9, 1989, Warrick entered Container's property without the permission or knowledge of Madden or Container and repossessed the skidder. Because the site was deserted, the repossession was accomplished without physical or verbal altercations with anyone. Through deposition testimony, however, Madden alleged that when he arrived for work on the morning of August 10, a padlock, which he says had secured a gate blocking access to Container's property, had been broken. Warrick denies the existence of a fence or a gate.
On August 29, 1989, Madden sued Deere and Warrick for damages, alleging a conversion of the skidder. The defendants subsequently moved for a summary judgment, which was entered on February 19, 1991. Madden contends that the summary judgment in favor of the defendants was improper because, he says, the record reveals substantial evidence of a wrongful repossession. In particular, he insists that Deere's repossession was accomplished (1) after his obligation on the note had been extinguished through an accord reached by the parties regarding the amount due on the account; and (2) by a breach of the peace through a breaking and entering and a trespass on private property.
 I. Accord and Satisfaction
Madden contends that when he tendered the check marked "paid in full" in the amount of $2,401.41, a bona fide dispute existed as to the amount due on the note. He insists that he and Warrick reached an accord as to the amount of the outstanding balance, and that the check, which was accepted by Warrick at the December 1988 meeting and which was unqualifiedly endorsed by Deere, extinguished any further liability on the note. Consequently, he insists, Deere's subsequent repossession of the skidder for nonpayment of the $1,309.37 Deere says was outstanding, was improper.
A contractual obligation may be extinguished or satisfied by the payment of an amount less than that contemplated under the original agreement, where the amount of the obligation is in dispute and the parties reach an accord as to the payment of a lesser sum. O'Neal v. O'Neal, 284 Ala. 661, 227 So.2d 430
(1969). For an accord to effect a satisfaction of an outstanding obligation, "there must be either a bona fide dispute as to the liability or its amount or it must be unliquidated, or the claim be not a moneyed demand." Wilson v.Monette, 224 Ala. 106, 109, 139 So. 264, 266 (1932).
A claim is defined as "liquidated" or "unliquidated" under the following conditions: *Page 863 
 "When a debtor knows precisely how much he is to pay and to whom he is to pay it, his debt is a liquidated one. 22 Am.Jur.2d, Damages §§ 180, 184 (1965). An amount claimed to be due is a liquidated sum when it is 'susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged.' Rifkin v. Safenovitz, 131 Conn. 411, 414, 40 A.2d 188 (1944) quoting Cochrane v. Forbes, 267 Mass. 417, 420, 166 N.E. 752 (1929); see Perri v. Cioffi, 141 Conn. 675, 678, 109 A.2d 355 (1954). It is sufficient for this purpose if the debt is measurable by a fixed or established external standard, or by a standard apparent from the documents upon which the plaintiff bases his claim. Ramada Development Co. v. United States Fidelity Guaranty Co., 626 F.2d 517, 525 n. 11 (6th Cir. 1980). Unliquidated damages, on the other hand, are those which are 'not yet reduced to a certainty in respect to amount, nothing more being established than the plaintiff's right to recover; or such as cannot be fixed by a mere mathematical calculation from ascertainable data in the case.' Black's Law Dictionary (4th Ed. 1968)."
Costello v. Hartford Institute of Accounting, Inc.,193 Conn. 160, 475 A.2d 310, 314 (1984); see also E.D. Wesley Co. v. Cityof New Berlin, 62 Wis.2d 668, 215 N.W.2d 657 (1974); Hendersonv. Lewis, 35 Ala. App. 267, 45 So.2d 716 (1950). LouisianaLumber Co. v. J.W. Farrior Lumber Co., 9 Ala. App. 383,63 So. 788 (1913).
Madden does not dispute his liability under the note and security agreement. He also concedes that as far as he was concerned, "there was no dispute or argument as to the amount due." Brief of Appellant, at 4. However, he purports to find the dispute upon which to base his accord and satisfaction argument in a statement contained in Warrick's affidavit regarding the circumstances surrounding Madden's tender of the $2,401.41. Regarding the alleged purpose of the payment, Madden gave the following account:
 "In December of 1988, the date in which the final payment under the contract became due, Mr. Warrick came to my house. He had some book with him and from this paperwork he gave me a figure for the payoff of the note. . . . I asked him if we could write paid in full on the check and he said to go ahead and write that on the check because the payment would pay off the balance on the account."
(Emphasis added.)
Warrick's version of the transaction is somewhat different. By affidavit, Warrick stated as follows:
 "In the month of December 1988, I traveled to the home of Willie C. Madden. At that time, my records revealed that Mr. Madden was in default and responsible for a past due balance in the amount of $5,376.41. However, my records only revealed past due balances and did not reveal if Mr. Madden had made his December 1988 payment or any other payments to be made in the future. During my visit, Mr. and Mrs. Madden indicated that they had previously paid, by check, $3,000 on Mr. Madden's account. They verified this by revealing an entry in their checkbook. Nevertheless, I then declared that I would have to collect the remaining balance that was past due.
Mr. and Mrs. Madden went into an adjoining room and discussed this matter for, what seemed to me, a long period of time. When Mr. Madden emerged from the room he asked if he could mark his check paid in full because of his belief that the requested payment would pay his account in full. I indicated that he could do so; however, that if any balances were left due and owing or if any checks did not clear, the account or balance would have to be paid in full, that any designation would be disregarded."
(Emphasis in affidavit.)
Based on this testimony, it appears that any dispute that arose contemporaneously with Madden's tender of the check for $2,401.41, resulted from a mere mathematical or clerical error
on Warrick's part. *Page 864 
Thus, Warrick's acquiescence in the payment resulted, not from the compromise of a contemporaneous dispute, but from his miscalculation or ignorance of the balance outstanding. In this connection, Madden, in deposition, conceded:
 "Question: The question is, is it more a case of their mistake as opposed to whether you owed the money or not?
 "[Answer By Madden]: I guess you could say that. The only thing I asked for was for them to show me — for Mr. Warrick to show me where I owed the money.
 "Question: I guess that's what I'm getting to. It's more a mistake in either their records or in their bookkeeping process as opposed to whether you owed the money?
"[By Counsel for Madden]: Object to the form.
"Answer: Yes."
The parties in this case were bound by the provisions of a valid contract, the terms of which clearly defined the amount of the outstanding balance that was undisputably due and payable. Despite Warrick's temporary uncertainty, the amount due on the note was readily susceptible of precise, mathematical calculation. Madden, therefore, in December 1988, had no grounds on which to base a good faith argument that he owed only $2,401.41 on the note. Indeed, it appears that the only dispute that existed arose following the December meeting and that it arose partially as a result of Madden's dishonored $3,000 check and his subsequent refusal to pay the outstanding balance of $1,309.37. The confusion that results from a mathematical error cannot be used to create an issue as to whether a bona fide dispute existed at the time the error was made.
We conclude that the debt was liquidated; therefore, Deere's unqualified endorsement of Madden's check, which was marked "paid in full" but which was for an amount less than that required by the contract, did not extinguish Madden's liability under the note. As a result, Madden was in default on the note when the defendants repossessed the skidder.
 II. Breach of the Peace
Madden contends that the defendants broke a lock on a gate barring access to Container's property; therefore, he insists, the repossession of the skidder was unlawful because it was accomplished by a breach of the peace. The defendants insist that the repossession was concluded peacefully and, therefore, that it was lawfully accomplished pursuant to Ala. Code 1975, § 7-9-503.
Section 7-9-503 contains the following "self-help" provision for secured creditors:
 "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without a breach of the peace or may proceed by action."
Id. (Emphasis added.) Section 7-9-503, the Alabama Legislature's enactment of U.C.C. § 9-503, codifies former law regulating repossession through self-help. Baker v. Keeble,362 F. Supp. 355 (M.D.Ala. 1973), aff'd sub nom. Brantley v. UnionBank Trust Co., 498 F.2d 365 (5th Cir.), cert. denied,419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974). Neither the drafters of U.C.C. § 9-503 nor the Alabama Legislature attempted to define the phrase "breach of the peace" as it relates to the conduct of secured creditors seeking to regain possession through self-help. See Comment, Breach of Peace andSection 9-503 of the Uniform Commercial Code — a ModernDefinition for an Ancient Restriction, 82 Dickinson L.Rev. 351, 355 (1978). It has been suggested that the "choice of the term 'breach of the peace' was not inadvertent" and that through the use of that phrase the "draftsmen intended to build upon the prior history of the self-help remedy." Id. at 354-55.
In the context of the limited privilege traditionally accorded to secured creditors to enter the land of another to reclaim collateral, the Restatement (Second) of Torts § 183 (1965) is instructive. That section suggests: *Page 865 
 "(1) Except as otherwise agreed, a conditional vendor . . . of a thing who is entitled to immediate possession thereof . . . is privileged, at a reasonable time and in a reasonable manner, to enter land in the possession of the vendee . . . for the purpose of taking possession of the thing and removing it from the land.
 "(2) The privilege stated in Subsection (1) is also available against
". . . .
 "(b) a possessor of land who, knowing or having reason to know of the transaction, has placed the thing on the land or consented to its being placed there."
Id. (Emphasis added.)
Under the Restatement view, the question of the extent of the creditor's privilege turns on the reasonableness of the manner and time of the entry. Of particular relevance to the facts of this case is comment h to § 183, which states:
 "h. Use of force. The privilege stated in this Section is one of entry in a peaceable and reasonable manner to remove the thing from the land. It does not justify the use of any force to enter, to remove the thing, or to prevent interference by the possessor. Since the conditional seller or other actor has parted freely and voluntarily with his original possession, he is not privileged to recover it by force, and must resort to his remedy at law. Compare § 101 and Comments. The actor will therefore be liable if he breaks and enters the land, as by removing a padlock."
Id. (Emphasis added.)[3] Under the Restatement principle, therefore, the use of force, such as the breaking or removing of a padlock, does not comport with concepts of reasonableness and peaceableness.
The principle defining the creditor's privilege in these terms is not inconsistent with the standard applied by this Court under pre-Code law, as well as under § 7-9-503, which prohibits self-help at the expense of the public peace. Under Alabama law, the secured creditor, in exercising the privilege to enter upon the premises of another to repossess collateral, may not perpetrate "[a]ny act or action manifesting force or violence, or naturally calculated to provide a breach of the peace," Crews Green v. Parker, 192 Ala. 383, 387, 68 So. 287,288 (1915); see also Street v. Sinclair, 71 Ala. 110 (1881);Folmar Sons v. Copeland Brantley, 57 Ala. 588 (1877). Neither may a creditor resort to constructive force, such as "threats or intimidation," Ford Motor Co. v. Ditton,52 Ala. App. 555, 557, 295 So.2d 408, 411 (Ala.Civ.App.), cert.denied, 292 Ala. 423, 295 So.2d 412 (1974); or to "fraud, trickery, chicanery, and subterfuge," Ford Motor Credit Companyv. Byrd, 351 So.2d 557, 559 (Ala. 1977).
The phrase "breach of the peace" has been further defined as any "situation tending to disturb the public order." Reno v.General Motors Acceptance Corp., 378 So.2d 1103, 1105 (Ala. 1979). It is "a disturbance of the public tranquility, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace, or, as is sometimes said, it includes any violation of any law enacted to preserve peace and good order." City of Akron v. Mingo, 169 Ohio St. 511, 513,160 N.E.2d 225, 226 (1959). Consequently, actual "[c]onfrontation or violence is not necessary to finding a breach of the peace."Salisbury Livestock Co. v. Colorado Cent. Credit Union,793 P.2d 470, 474 (Wyo. 1990).
The courts of Alabama, as well as those of its sister states, have recognized that a mere trespass does not automatically constitute a breach of the peace. In Reno v. General MotorsAcceptance Corp., 378 So.2d 1103 (Ala. 1979), agents of the creditor "located the plaintiff's automobile in the parking lot of the Western Super Market in Tarrent, where the plaintiff was at work on the night shift." Id. Using a duplicate key, the agents started the automobile *Page 866 
and drove it off the parking lot without the knowledge of the debtor. In affirming a summary judgment in favor of the creditor, this Court implicitly held that a creditor is privileged to enter the parking lot of a business open to the public in order to take possession of collateral. See Ash v.Peoples Bank of Greensboro, 500 So.2d 5 (Ala. 1986) (where debtor's automobile was parked on a public street and debtor was not present when the automobile was repossessed by the creditor's agent, it was undisputed that no breach of the peace occurred); Ford Motor Co. v. Ditton, 52 Ala. App. 555,295 So.2d 408 (Ala.Civ.App.) (where vehicle was repossessed from parking lot at debtor's place of employment without debtor's knowledge, no breach of the peace occurred), cert. denied,292 Ala. 423, 295 So.2d 412 (1974); see also Butler v. Ford MotorCredit Co., 829 F.2d 568 (5th Cir. 1987) (under Mississippi law, repossession of vehicle from debtor's open driveway was, as a matter of law, not a breach of the peace); Oaklawn Bank v.Baldwin, 289 Ark. 79, 709 S.W.2d 91, 92 (1986) (where creditor's agent repossessed vehicle from debtor's driveway without entering "any gates, doors or other barricades to reach the truck," no breach of the peace occurred); Raffa v. DaniaBank, 321 So.2d 83, 85 (Fla.Dist.Ct.App. 1975) (where vehicle was parked partially under an enclosed carport in debtor's driveway, no breach of the peace occurred, it being "undisputed that no door, not even one to a garage, on the [debtor's] premises was opened, much less broken"); CensusFederal Credit Union v. Wann, 403 N.E.2d 348, 351 (Ind.App. 1980) (repossession of vehicle from parking lot of apartment building where debtor lived did not constitute breach of the peace; although "secured party may not . . . break into or enter into homes or other buildings or enclosed spaces" it "may . . . take a chattel off a street, parking lot or unenclosed space").
However, when the collateral is located inside fences or is otherwise enclosed, the secured creditor's privilege is considerably abridged. Rogers v. Allis-Chalmers Credit Corp.,679 F.2d 138 (8th Cir. 1982) (entry onto property of third party through "at least one gate" to repossess machinery created issue of fact whether breach of peace occurred). The creditor's privilege is most severely restricted when repossession can be accomplished only by the actual breaking or destruction of barriers designed to exclude intruders. Thus, at least one case has held that the actions of a creditor's agents in "cutting a chain used to lock a fence which enclosed the [debtor's] property" to gain access to collateral "constitute[d] a 'breach of the peace' within the meaning of the Pennsylvania [counterpart of § 7-9-503]." Laurel Coal Co.v. Walter E. Heller Co., 539 F. Supp. 1006 (W.D.Pa. 1982); cf. Bloomquist v. First National Bank of Elk River,378 N.W.2d 81 (Minn.App. 1985) (removing cracked window pane to gain entry constituted breach of the peace as a matter of law). These cases at least implicitly acknowledge that the likelihood of a breach of the peace increases in proportion to the efforts of the possessor to prevent unauthorized intrusions and the creditor's conduct in defiance of those efforts.
The Alabama Legislature, in formulating this state's criminal trespass statutes, has apparently applied a similar rationale. For example, Ala. Code 1975, § 13A-7-3(a), provides that "[a] person is guilty of criminal trespass in the second degree if he knowingly enters or remains unlawfully in a building or upon real property which is fenced or enclosed in a manner designedto exclude intruders." (Emphasis added.) Section 13A-7-4(a) provides that "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises." (Emphasis added.) The Commentary to those sections states:
 "In formulating the offense of criminal trespass, the Criminal Code recognizes the seriousness of unauthorized intrusions upon premises. . . .
". . . .
 "Section 13A-7-3 provides for liability if one knowingly enters or remains unlawfully in a building or on real property which is fenced or enclosed so as to exclude intruders. Such conduct indicates *Page 867 a deliberate invasion of another's property, and in many cases is the prelude to tortious or more serious criminal conduct. . . .
 "The second place protected by § 13A-7-3 — fenced or enclosed property — may present occasional difficulty. However, it will always be for the trier of fact to determine whether the fence or other device was 'designed to exclude intruders.' At one extreme may be an eight foot fence, topped with barbed wire, obviously designed to exclude intruders. On the other hand, shrubbery that is two feet high may not be so designed, e.g., the owner's purpose is decorative rather than protective.
 "Section 13A-7-4, criminal trespass in the third degree, is the basic dividing line between criminal and noncriminal trespass."
Id. (Emphasis added.) From these sections and their commentary, it logically follows that the potential for breaches of the public peace and tranquility as a result of unauthorized intrusions on property escalates in direct proportion to the presence of fences, gates, signs, and other indicia of nonassent to entry.
In light of the foregoing discussion, we are unable to conclude that the breaking of a lock to gain entrance to the premises on which collateral is located does not constitute a breach of the peace as a matter of law. Indeed, whether the actions taken by a secured creditor to repossess collateral involves excessive force or an unreasonable likelihood of a breach of the peace in light of the time and manner in which the repossession occurred is ordinarily a question of fact to be determined by a jury. Cf. Abernathy v. State, 42 Ala. App. 149,155, 155 So.2d 586, 592 (1962) ("whether certain conduct constitutes a breach of the peace depends largely upon the facts of each particular case and the circumstances surrounding the incident"), cert. denied, 275 Ala. 691, 155 So.2d 592
(1963), rev'd on other grounds, 380 U.S. 447, 85 S.Ct. 1101,14 L.Ed.2d 151 (1965).
In this case, Madden contends that access to Container's property was blocked by a locked gate, which, he insists, Warrick forced open to gain access to the skidder. Warrick not only denies breaking the lock but also denies the existence of a fence or a gate. Viewing this conflicting evidence in a light most favorable to the nonmovant, the plaintiff, we must conclude that substantial evidence exists in support of his claim and that there exists a genuine issue of material fact, thus precluding a judgment as a matter of law. Rees v. PeoplesBank of Greensboro, 571 So.2d 1035, 1036 (Ala. 1990). Consequently, the judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED; APPLICATION OVERRULED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
[1] The $3,000 check was subsequently returned unpaid because of insufficient funds. Deere eventually collected the amount of the check "minus a $5 service charge." However, on January 6, 1989, following the return of the unpaid check, Deere had erroneously credited Madden's account for $2,995. On January 13, 1989, Deere further credited Madden's account for $2,401.41, the amount of the check given to Warrick during the December visit. The bookkeeping error was discovered and was corrected by a proper debit of the account on May 30, 1989, leaving a debit balance of $1,309.37.
[2] Madden's refusal to pay the outstanding balance was based in part on confusion generated by the bookkeeping error that erroneously created a double credit of his account for the amount of his dishonored $3,000 check.
[3] Also, comment e, focusing on the reasonableness of the creditor's actions with regard to the time of his conduct, states that the "entry to resume possession must be at a reasonable time. An entry in the nighttime or in time of serious illness or other misfortune may be at an unreasonable time."