Carlos CHAPA and Maria Chapa, Individually and as Next Friend of Carlos Chapa, Jr. and Alex Chapa, Minors, Appellants,

v.

TRACIERS & ASSOCIATES, Incorporated; Traciers & Associates; Traciers; Paul Chambers; and Ford Motor Credit Corp., Appellees.

No. 14–07–00056–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 31, 2008.

Rehearing Overruled Oct. 9, 2008.

Timothy E. McKenna, Houston, TX, for appellants.

Terry Fitzgerald, The Woodlands, Robert G. Devlin, Houston, TX, for appellees.

Panel consists of Justices YATES, GUZMAN, and BROWN.

## OPINION

EVA M. GUZMAN, Justice.

In this appeal, we must determine whether appellants, the parents of two young children, have legally cognizable claims for mental anguish allegedly sustained when a repossession agent towed their vehicle out of sight before he realized their children were inside. The parents filed suit against the financing company, the repossession company it hired, and the repossession agent who towed the vehicle. They asserted claims for mental anguish and its physical manifestations under (a) section 9.609 of the Business and Commerce Code, (b) the Restatement (Second) of Torts, or (c) negligence law, including the law governing bystander claims. The trial court granted summary judgment for the defendants on the parents' claims. Neither parent witnessed the vehicle being towed from the street, and the repossession agent discovered the children and returned them and the vehicle within minutes. On these facts, we conclude that, as a matter of law, appellants Carlos and Maria Chapa do not have a viable claim for breach of the peace under section 9.609 of the Business and Commerce Code. We further hold that the financing company

and its agents are not liable to the Chapas under sections 424 or 427 of the Restatement (Second) of Torts. Moreover, we conclude Maria Chapa's bystander and other negligence claims fail as a matter of law. We therefore affirm the trial court's grant of summary judgment.

## I. Factual and Procedural Background[1]

Ford Motor Credit Corp. ("FMCC") hired Traciers & Associates ("Traciers")[2] to repossess a white 2002 Ford Expedition owned by Marissa Chapa, who was in default on the associated promissory note. Traciers assigned the job to its field manager, Paul Chambers, and gave him an address where the vehicle could be found. FMCC, Traciers, and Chambers were unaware that the address was that of Marissa's brother, Carlos Chapa. Coincidentally, Carlos and his wife Maria Chapa also had purchased a white Ford Expedition financed by FMCC. Their vehicle, however, was a 2003 model, and the Chapas were not in default.

On the night of February 6, 2003, Chambers went to the address and observed a white Ford Expedition. The license number of the vehicle did not match that of the vehicle he was told to repossess, and he did not see the vehicle's vehicle identification number ("VIN"), which was obscured. Chambers returned early the next morning and still could not see the Expedition's VIN. He returned to his own vehicle, which was parked two houses away.

Unseen by Chambers, Maria Chapa left the house and helped her two sons, ages ten and six, into the Expedition for the trip to school. Her mother-in-law's vehicle was parked behind her, so Maria backed her mother-in-law's vehicle into the street, then backed her Expedition out of the driveway and parked on the street. She left the keys to her truck in the ignition with the motor running while she parked her mother-in-law's car back in the driveway and reentered the house to return her mother-in-law's keys.

After Chambers saw Maria park the Expedition on the street and return to the house, it took him only thirty seconds to back his tow truck to the Expedition, hook it to his truck, and drive away. Chambers did not leave his own vehicle to perform this operation, and it is undisputed that he did not know the Chapa children were inside.[3] When Maria emerged from the house, the Expedition, with her children, was gone. Maria began screaming, telephoned 911, and called her husband at work to tell him the children were gone.

Meanwhile, on an adjacent street, Chambers noticed that the Expedition's wheels were turning, indicating to him that the vehicle's engine was running. He stopped the tow truck and heard a sound from the Expedition. Looking inside, he discovered the two Chapa children. After he persuaded one of the boys to unlock the vehicle, Chambers drove the Expedition back to the Chapas' house. He returned the keys to Maria, who was outside her house, crying. By the time emergency personnel and Carlos Chapa arrived, the children were back home and Chambers had left the scene.

Maria testified that the incident caused her to have an anxiety attack, including

1. The following facts are drawn from the summary-judgment evidence in the record and are not in dispute.

2. The Chapas sued entities identified as "Traciers," "Traciers & Associates," and "Traciers & Associates, Incorporated." We use the term "Traciers" to refer collectively to all of these entities.

3. Chambers did not see the children in the back seat through the tinted windows of the Expedition.

chest pain and numbness in her arm. She states she has continued to experience panic attacks and has been diagnosed with an anxiety disorder. In addition, both Carlos and Maria have been diagnosed with post-traumatic stress disorder.

Acting individually and on behalf of their children, Carlos and Maria Chapa sued Traciers, Chambers, and FMCC. Appellees settled the children's claims but contested the individual claims of Carlos and Maria. The trial court granted summary judgment on the parents' claims in favor of Traciers, Chambers, and FMCC, and this appeal ensued.

## II. Issues Presented

The Chapas present three compound issues for review. In their first issue, they contend that they have legally cognizable causes of action against Traciers and FMCC for the physical and psychological injuries they sustained as a result of the appellees' breach of the duties imposed by (a) section 9.609 of the Texas Business and Commerce Code, (b) the Restatement (Second) of Torts, or (c) the common law governing negligence claims generally. In their second issue, the Chapas argue that, as a bystander, Maria suffered compensable injuries arising from the tort committed against her children. Finally, the Chapas assert in their third issue that the trial court erred in granting summary judgments dismissing their claims.

## III. Standard of Review

We review summary judgments de novo,[4] and where the trial court grants the

4. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005).

5. Eleven original or amended motions for summary judgment were filed, and the trial court entered eight orders on the various motions before rendering final judgment disposing of the remaining individual claims of

judgment without specifying the grounds, we affirm the summary judgment if any of the grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000). We consider all grounds the appellant preserves for review that are necessary for final disposition of the appeal. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996). Here, appellees moved for summary judgment on both traditional and no-evidence grounds;[5] thus, we apply the familiar standard of review appropriate for each type of summary judgment, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *See Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 157 (Tex.2004) (traditional summary judgment); *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (no-evidence summary judgment).

## IV. Analysis

### A. Section 9.609 of the Texas Business and Commerce Code

■■■ The Chapas first argue that the trial court erred in granting summary judgment against them on their claim that appellees are liable under section 9.609 of the Business and Commerce Code. This statute provides in pertinent part:

 (a) After default, a secured party:

 (1) may take possession of the collateral;

Carlos and Maria Chapa. Traciers and Chambers moved for traditional summary judgment regarding the Chapas' common-law negligence claims and their entitlement to damages for mental anguish, and the remaining claims were the subject of motions for no-evidence summary judgment.

(b) A secured party may proceed under Subsection (a):

. . .

(2) without judicial process, if it proceeds without breach of the peace.

TEX. BUS. & COM.CODE ANN. § 9.609 (Vernon 2002). The Chapas correctly point out that this statute imposes a duty on secured creditors to take precautions for public safety when repossessing property. *See MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 153 (Tex.1992) (interpreting predecessor statute). Thus, the creditor who elects to pursue nonjudicial repossession assumes the risk that a breach of the peace might occur. *Id.* at 154. A secured creditor "remains liable for breaches of the peace committed by its independent contractor." *Id.* (citing RESTATEMENT (SECOND) OF TORTS, PRECAUTIONS REQUIRED BY STATUTE OR REGULATION, § 424 (1965)). Thus, a creditor cannot escape liability by hiring an independent contractor to repossess secured property.

The Chapas assert that FMCC and Traciers, who employed Chambers as a repossession agent, are liable for any physical or mental injuries sustained by Carlos and Maria as a result of Chambers's breach of the peace. But this argument presupposes that a breach of peace occurred. Although the material facts regarding Chambers's conduct are not in dispute, appellees deny that his conduct constituted a breach of the peace and moved for no-evidence summary judgment on the ground that no such breach occurred. If appellees are correct, then we may affirm summary judgment on the claims asserted under section 9.609 without further analysis. *See* TEX.R.APP. P. 47.1.

■ In their arguments concerning breach of the peace and its associated lia-

bility, the Chapas rely most heavily on authorities addressing breaches of the peace under Texas criminal law and cases from other jurisdictions discussing breaches of the peace under the Uniform Commercial Code. Because a breach of the peace under the criminal code would also constitute a breach of the peace under the Uniform Commercial Code, we address both sources of authority.

### 1. Breach of the Peace Under Criminal Law

In support of their argument that Chambers breached the peace, the Chapas rely on the following language from *Corpus Juris*, adopted by the Texas Court of Criminal Appeals in 1936:

The term 'breach of the peace' is generic, and includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquillity enjoyed by the citizens of a community; a disturbance of the public tranquillity by any act or conduct inciting to violence or tending to provoke or excite others to break the peace; a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm disturbs the peace and quiet of the community. By 'peace,' as used in this connection, is meant the tranquillity enjoyed by the citizens of a municipality or a community where good order reigns among its members. Breach of the peace is a common-law offense. It has been said that it is not a specific offense, yet it may be, and at times is, recognized as such by statute or otherwise; and only when so regarded will it be considered in this article.

The offense may consist of acts of public turbulence or indecorum in violation of the common peace and quiet, of an invasion of the security and protec-

tion which the laws afford to every citizen, or of acts such as tend to excite violent resentment or to provoke or excite others to break the peace. Actual or threatened violence is an essential element of a breach of the peace. Either one is sufficient to constitute the offense. Accordingly, where means which cause disquiet and disorder, and which threaten danger and disaster to the community, are used, it amounts to a breach of the peace, although no actual personal violence is employed. Where the incitement of terror or fear of personal violence is a necessary element, the conduct or language of the wrongdoer must be of a character to induce such a condition in a person of ordinary firmness.

*Head v. State,* 131 Tex.Crim. 96, 99, 96 S.W.2d 981, 982–83 (1936) (on mot. for reh'g). As further explained in *Corpus Juris Secondum,* "[t]he acts involved, to constitute a breach of the peace, must also be voluntary, unnecessary, and contrary to

ordinary human conduct." 11 C.J.S. *Breach of the Peace* § 4 (1995).

The Chapas argue that Chambers's conduct is of the type that has been found to constitute a breach of peace under Texas criminal law.[6] Without further explanation, the Chapas assert that "[t]he act of taking children from the possession of their mother which leaves her in a hysterical crying state, is clearly a breach of peace."

### 2. Criminal Breach of the Peace Distinguished

█ Whether a specific act constitutes a breach of the peace depends on the surrounding facts and circumstances in the particular case. *Miles v. State,* 241 S.W.3d 28, 40 (Tex.Crim.App.2007) (citing *Woods v. State,* 152 Tex.Crim. 338, 341, 213 S.W.2d 685, 687 (1948)). But in each of the cases on which the Chapas rely, the described conduct falls within the proscription adopted in *Head v. State.* Conduct

---

6. *See, e.g., Romo v. State,* 577 S.W.2d 251, 253 (Tex.Crim.App.1979) (driving while intoxicated); *Woods v. State,* 152 Tex.Crim. 338, 342, 213 S.W.2d 685, 688 (1948) ("It is this claimed unprovoked assault by a man upon a woman in a public place and in the presence not only of her husband but of others that brings the act of deceased within the definition of a breach of the peace."); *Leache v. State,* 22 Tex.App. 279, 314, 3 S.W. 539, 546 (1886) ("It is made a disturbance of the peace if one in a public place, street, or highway, or near a private house, shall use loud and vociferous language, or swear or curse in a manner calculated to disturb the inhabitants."); *Dunn v. State,* 979 S.W.2d 403, 409 (Tex. App.–Amarillo 1998, pet. ref'd) (defendant breached peace within arresting citizen's presence when, after being asked to leave citizen's private property, defendant attempted to conceal his presence there during a manhunt for an armed fugitive); *Knot v. State,* 853 S.W.2d 802, 805 (Tex.App.–Amarillo 1993, no pet.) (swinging or throwing a beer bottle at another person in a public place); *Crowley v. State,* 842 S.W.2d 701, 704 (Tex.

App.–Houston [1st Dist.] 1992) (driver who flees the scene of an accident breaches the peace), *pet. ref'd,* 830 S.W.2d 613 (Tex.Crim. App.1992). The Chapas also cite *Meyers v. Ford Motor Credit Co.* for the proposition that unreasonable property damage constitutes a breach of peace. 619 S.W.2d 572 (Tex.Civ. App.–Houston [14th Dist.] 1981, no writ), *abrogated on other grounds, Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 304 (Tex.1988). In *Meyers,* however, we were not required to and did not determine this issue because it was not in dispute. *See id.* at 574 (defendant secured creditor agreed with plaintiff's contention that breaking into locked garage at 2:00 a.m. and causing substantial damage to garage while removing vehicle would, if proven, constitute a breach of peace). *But cf. Giese v. NCNB Tex. Forney Banking Ctr.,* 881 S.W.2d 776, 783 (Tex.App.– Dallas 1994, no writ) (citing *Meyers* and stating that pleadings alleging that repossession agents demolished improvements to real property while repossessing mobile home adequately asserted breach of peace).

such as driving while intoxicated,[7] or publicly assaulting someone without provocation, with or without a weapon,[8] poses an immediate threat of violent physical injury.[9] Fleeing the scene of an accident[10] or attempting concealment on private property during a manhunt[11] are acts that invade "the security and protection which the laws afford to every citizen." *See id.* The public use of verbally abusive language that is "calculated to disturb" others is an act of "public indecorum" that is intended to disrupt the public peace or tranquility.[12] Finally, all of these acts are "voluntary, unnecessary, and contrary to ordinary human conduct." *See* 11 C.J.S. *Breach of the Peace* § 4 (1995).

In contrast, here the parties do not assert that Chambers behaved violently or threatened physical injury to anyone. *Cf. id.* ("[A]ctual or threatened violence is an essential element of a breach of the peace. . . ."). Further, it is undisputed that Chambers did not know the children were in the vehicle when he moved it; thus, his actions cannot be appropriately characterized as "contrary to ordinary human conduct." *Cf. id.* When Chambers learned of the children's presence, he immediately ceased any attempt to repossess the vehicle and instead drove the children home.[13] He did not communicate by word or gesture with Carlos or Maria Chapa before or during the attempted repossession. *Cf. Coggin v. State*, 123 S.W.3d 82, 92 (Tex.App.–Austin 2003) (suggesting that conduct that would "incite an immediate breach of the peace contemplates a face-to-face encounter").

In sum, the Chapas do not argue that Chambers's words or behavior toward the children or anyone else were intimidating, indecorous, or calculated to have a disturbing effect. *Cf. Heath v. Boyd*, 141 Tex. 569, 573, 175 S.W.2d 214, 216 (1943) (con-

7. *See Romo,* 577 S.W.2d at 252–53.

8. *See Woods,* 152 Tex.Crim. at 342, 213 S.W.2d at 687 (no weapon; actor struck and kicked appellant's wife); *Knot,* 853 S.W.2d at 805 (beer bottle used as a weapon).

9. *See Head,* 131 Tex.Crim. at 99, 96 S.W.2d at 982 (public conduct that "threaten[s] danger and disaster to the community" breaches the peace (quoting 9 *Corpus Juris* at 386–88)).

10. *See Crowley,* 842 S.W.2d at 704. In *Crowley,* the First Court of Appeals took "judicial notice of the number of traffic-related incidents that lead to violence in Harris County" and explained that fleeing the scene of an accident is "likely to arouse violent resentment that incites others to break the peace." *Id.* The court further reasoned that Crowley "invaded the security and protection afforded to every citizen when she failed to stop and provide [the other driver] with the information required by statute." *Id.*

11. *See Dunn,* 979 S.W.2d at 409. *Dunn* was decided on narrow and very specific facts. As the Seventh Court of Appeals explained,

> Appellant was criminally trespassing, for he had previously been asked to leave. . . . When the stockman discovered appellant the second time that day, he was aware of a recent armed robbery and the ongoing manhunt for a wanted fugitive, and appellant was actively concealing his presence by laying low in the brush. Given the facts, appellant's attempt to conceal his presence on the private property of another, during the course of a manhunt for an armed fugitive, constituted an "invasion of the security and protection which the laws afford every citizen" and rose to the level of "threatened violence."
>
> *Id.*

12. *See Leache,* 22 Tex.App. at 314, 3 S.W. at 546 (cursing in a public place in a manner calculated to disturb the inhabitants).

13. *Cf.* Tex. Penal Code Ann. § 42.01 (Vernon Supp.2007) (offense of disorderly conduct, which effectively codifies many breaches of the peace, requires intentional or knowing conduct); *see also* Tex. Bus. & Com.Code Ann. § 9.609(b)(2)(b) (nonjudicial repossession permitted "if it *proceeds* without breach of the peace") (emphasis added).

cluding that appellant who did not exhibit a weapon, "yell, shriek, curse, abuse or threaten anybody, or commit any other act denounced as a breach of the peace" by statute did not breach peace). On these facts, we cannot say that Chambers's conduct constitutes a "breach of the peace" as that phrase ordinarily is used in criminal or common law.

### 3. Breach of the Peace under the Uniform Commercial Code

The Chapas also rely on cases from other jurisdictions specifically addressing breaches of the peace as described in the Uniform Commercial Code concerning repossession of property. They cite *Robinson v. Citicorp National Services, Inc.*, a Missouri case in which Clarence Robinson defaulted on his automobile payments. 921 S.W.2d 52, 53 (Mo.Ct.App.1996). Agents of the financing company's assignee attempted to repossess the car from property owned by Marie Robinson. *Id.* Marie's husband, Odell Robinson, Sr., "told [a repossession agent] to get off the property numerous times to no avail. *The alleged trespass and breach of peace ensued,* and Odell suffered a heart attack and died." *Id.* (emphasis added). This case stands for the proposition that the duty to avoid a breach of peace is non-delegable, but the conduct constituting a breach of the peace is not described.[14] We can determine only

that there was a confrontation on the appellant's property between repossession agents and a person objecting to the repossession. Here, however, Chambers removed the vehicle without confrontation and without trespassing on the Chapas' premises.

The Chapas also point to *Nixon v. Halpin.* 620 So.2d 796 (Fla.Dist.Ct.App.1993). In that case, Halpin, a repossession agent, was seen by the vehicle's owner and mistaken for a car thief. *Id.* at 797. The car's owner summoned his office mate, Nixon, and the two men attempted to detain Halpin. *Id.* While driving away, Halpin struck Nixon. *Id.* The *Nixon* court concluded that the vehicle owner had a right to object to the attempted repossession. *Id.* at 798. It further held that if the creditor "had not already peaceably removed the vehicle when the owner objected, it's [sic] continuation with the attempt at repossession was no longer 'peaceable and without a breach of the peace.'" *Id.* In this case, however, the repossession agent had "already peaceably removed the vehicle" and did not continue to attempt repossession after he learned of the Chapa children's presence. Thus, the reasoning in *Nixon* supports the conclusion that Chambers did not breach the peace.[15]

---

**14.** The Chapas also rely on the Alabama case of *General Finance Corp. v. Smith,* another case in which the conduct constituting a breach of peace is not described. 505 So.2d 1045, 1046 (Ala.1987) (per curiam) ("The case was submitted to the jury on conflicting evidence. For purposes of our discussion, we find it unnecessary to state the tendencies of the evidence in detail.").

**15.** In addition, the Chapas rely on *Griffith v. Valley of the Sun Recovery & Adjustment Bureau, Inc.,* another case in which the repossession agent was mistaken for a car thief. 613 P.2d 1283, 1284 (1980). The agent set off the car's burglar alarm, and one of the car own-

er's neighbors responded to the scene with a shotgun. *Id.* The owner shouted for the gun, and as the neighbor passed the gun to the vehicle owner, it accidently discharged and severely injured a bystander. *Id.* As with the previous cases, this case is readily distinguishable from the present case, in which the repossession agent was unseen and no confrontation occurred. Other cases cited by the Chapas are distinguishable on the same basis. *See, e.g., Morris v. First Nat. Bank & Trust Co. of Ravenna, Ohio,* 254 N.E.2d 683, 686–87 (1970) (breach of peace occurred when agents were "physically confronted by appellant's representative, disregarded his request to desist their efforts at repossession and refused to

### 4. UCC Usage Distinguished

■ Most frequently, the expression "breach of the peace" as used in the Uniform Commercial Code "connotes conduct that incites or is likely to incite immediate public turbulence, or that leads to or is likely to lead to an immediate loss of public order and tranquility." *Johnson v. Grossinger Motorcorp, Inc.*, 324 Ill.App.3d 354, 257 Ill.Dec. 236, 753 N.E.2d 431, 440 (2001); *see also Madden v. Deere Credit Servs., Inc.*, 598 So.2d 860, 865 (Ala.1992) ("[S]ecured creditor, in exercising privilege to enter upon premises of another to repossess collateral, may not perpetrate '[a]ny act or action manifesting force or violence, or naturally calculated to provide a breach of peace' (quoting *Crews & Green v. Parker*, 192 Ala. 383, 68 So. 287, 288 (1915))"); *Salisbury Livestock Co. v. Colo. Cent. Credit Union*, 793 P.2d 470, 474 n. 3 (Wyo.1990) ("[A]lthough actual violence is not required to find 'breach of the peace,' within meaning of self-help repossession statute, disturbance or violence must be reasonably likely, and not merely a remote possibility."); *cf. Ash v. Peoples Bank of Greensboro*, 500 So.2d 5, 6–7 (Ala.1986) (no breach of peace when vehicle repossessed from public street while debtor inside house). In addition, "[b]reach of the peace . . . refers to conduct at or near and/or incident to seizure of property." *Jordan v. Citizens & S. Nat'l Bank of South Carolina*, 278 S.C. 449, 298 S.E.2d 213, 214 (1982); *see also Census Fed. Credit Union v. Wann*, 403 N.E.2d 348, 351–52 (Ind.Ct. App.1980) ("[E]ven in attempted repossession of a chattel off a street, parking lot or unenclosed space, if repossession is verbally or otherwise contested at actual time of and in immediate vicinity of attempted repossession by defaulting party or other person in control of chattel, secured party must desist and pursue his remedy in court.").

Here, there is no evidence that Chambers proceeded with the attempted repossession over an objection communicated to him at, near, or incident to the seizure of the property. To the contrary, Chambers immediately "desisted" repossession efforts and peaceably returned the vehicle and the children when he learned of their presence. Moreover, Chambers actively avoided confrontation. By removing an apparently unoccupied vehicle from a public street when the driver was not present, he reduced the likelihood of violence or other public disturbance.

In sum, the Chapas have not identified and we have not found any case in which the repossession of a vehicle from a public street, without objection or confrontation, has been held to constitute a breach of the peace. *Cf. Wallace v. Chrysler Credit Corp.*, 743 F.Supp. 1228, 1231–33 (W.D.Va. 1990) (deputy sheriff did not breach the peace when he repossessed debtor's truck because, even if he violated traffic regulation when he drove away, he did so before debtor had an opportunity to confront him); *Wann*, 403 N.E.2d at 351–52 (no breach of the peace occurred when repossession from parking lot was not verbally or otherwise contested). We therefore conclude that Chambers's conduct did not violate a duty imposed by section 9.609 of

depart from the private premises"); *Manhattan Credit Co. v. Brewer*, 232 Ark. 976, 341 S.W.2d 765, 766 (1961) (conversion occurs if force or threats of force are used); *Hollibush v. Ford Motor Credit Co.*, 179 Wis.2d 799, 508 N.W.2d 449, 451–52 (1993) (breach of peace occurred when vehicle repossessed over ob-

jections of owner's fiancé); *Nichols v. Metro. Bank*, 435 N.W.2d 637, 638–39 (Minn.Ct.App. 1989) (repossession agent approached owner as she drove into her driveway, demanded she surrender her car, reached through window, "took hold" of owner's hand, turned off car, and took car keys).

the Texas Business and Commerce Code.[16]

## B. Restatement (Second) of Torts

The Chapas also contend that appellees violated duties owed to them under two provisions of the Restatement (Second) of Torts. On this record, however, we conclude that neither section applies.

### 1. Section 424

Section 424 of the Restatement (Second) of Torts provides as follows:

> One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.

RESTATEMENT (SECOND) OF TORTS, PRECAUTIONS REQUIRED BY STATUTE OR REGULATION, § 424 (1965). This provision permits a plaintiff to hold an entity vicariously liable for the acts of that entity's independent contractors. The Chapas argue that because section 9.609 of the Business and Commerce Code imposed a duty on Chambers to refrain from breaching the peace, Traciers and FMCC are liable for Chambers's violation of that duty. But because Chambers did not breach the peace, this provision is inapplicable.

### 2. Section 427

 The Chapas additionally assert that Traciers and FMCC also may be liable under section 427 of the Restatement (Second) of Torts. Under this provision, an employer is liable for physical harm caused by an independent contractor's performance of inherently dangerous work:

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, ·or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

*Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 794 n. 36 (quoting RESTATEMENT (SECOND) OF TORTS § 427 (1965)). Such inherently dangerous activities are "those that are dangerous in their normal, nondefective state." *Cent. Ready Mix Concrete Co., Inc. v. Islas,* 228 S.W.3d 649, 652–53 (Tex.2007).

The Chapas reason that nonjudicial repossession is an inherently dangerous activity, and thus, FMCC and Traciers are liable for Chambers's failure to take precautions to prevent their injuries. In support of this argument, the Chapas point to *Sanchez v. MBank of El Paso,* in which the Eighth Court of Appeals, relying on section 427 of the Restatement, held that nonjudicial repossession is inherently dangerous. 792 S.W.2d 530, 531–32 (Tex. App.–El Paso 1990), *aff'd on other grounds,* 836 S.W.2d 151, 152 n. 2 (Tex. 1992). In reaching this conclusion, the court reasoned as follows:

> Since there is likelihood that the repossessor will commit a technical trespass by entering upon someone else's property to take possession of the collateral and that the repossession will be done

---

16. Appellees also argue that section 9.609 does not apply because Chambers did not intend to repossess the vehicle owned by Carlos and Maria Chapa, who were not in default. Because we conclude that Chambers did not breach the peace, we do not address appellees' argument that a person who inadvertently repossesses the wrong vehicle does not have a statutory duty to avoid breaching the peace.

not only without the owner's consent but in many cases against his will, there is a considerable risk that a breach of the peace, assault or worse may occur. *Id.* at 532.

■ Section 427, however, imposes liability only for (a) physical harm (b) caused by the failure to take reasonable precautions against the inherent dangers of the work. As previously discussed, however, no breach of the peace occurred in this case, and there is no allegation of assault. Contrary to the Chapas' characterizations on appeal, FMCC and Traciers did not physically harm them; rather, the Chapas allegedly sustained mental and emotional harm and physical manifestations of anxiety, depression, and post-traumatic stress disorder.[17] These physical manifestations appear to be part of their asserted mental-anguish damages. *See City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex.1997) (noting that mental-anguish damages are generally available if the harm arises from bodily injury, intentional or malicious conduct, knowing violation of a statute, breach of a duty arising out of a special relationship, or an injury of such shocking or disturbing nature that mental anguish is highly foreseeable). Moreover, their injuries are not the result of a failure to take reasonable precautions against those risks identified in *Sanchez* as dangers inherent in nonjudicial repossession.[18]

■ The claims of Carlos and Maria Chapa do not fall within those described in *Likes*, but instead more closely resemble a common-law claim of negligent infliction of emotional distress. This tort consists of "mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544, 114 S.Ct. 2396, 2405, 129 L.Ed.2d 427 (1994). With limited exceptions, claims of negligent infliction of emotional distress are not recognized under Texas law. *Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex.1993) (op. on mot. for reh'g) ("[T]here is no general duty in Texas not to negligently inflict emotional distress. A claimant may recover mental anguish damages only in connection with defendant's breach of some other legal duty."). And although the Chapas argue that their physical manifestations of emotional distress are distinct physical injuries, the cases on which they rely do not support recovery for such physical manifestations under section 427 and are otherwise distinguishable on the facts.[19]

---

17. We note that in their answers to requests for admission, the Chapas characterized their physical injuries as manifestations of mental or emotional harm.

18. *Sanchez* has not been widely followed. *See MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 159–60 (Tex.1992) (Hecht, J., dissenting) (listing activities that have been held not to be inherently dangerous, including use of heavy equipment, inflammable materials, electrical work, blasting, and refinery operations, and concluding that nonjudicial repossession also is not inherently dangerous). Texas courts have found very few activities "inherently dangerous." *See Islas*, 228 S.W.3d at 652 n. 12 (Tex.2007) (collecting cases). Moreover,

at least three courts of other jurisdictions have held that nonjudicial repossession is not inherently dangerous. *See, e.g., Gfeller v. Russo*, 45 A.D.3d 1301, 1303, 846 N.Y.S.2d 501, 503 (N.Y. Nov. 9, 2007); *Jiggetts v. Lancaster*, 138 N.C.App. 546, 531 S.E.2d 851, 853 (2000); *Bible v. First Nat'l Bank of Rawlins*, 21 Ariz.App. 54, 515 P.2d 351, 354–55 (1973).

19. *See, e.g., St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 650 (Tex.1987) (body of infant was delivered to a mortuary and disposed of in an unmarked, common grave without the knowledge or consent of either parent), *rev'd on other grounds, Boyles*, 855 S.W.2d at 597; *Bailey v. Am. Gen. Ins. Co.*, 154 Tex. 430, 432–33, 279 S.W.2d 315, 316 (1955) (workers

Because the Chapas' claims consist of negligently inflicted mental anguish and its physical manifestations, we conclude that neither section 427 of the Restatement nor general negligence law supports the Chapas' claims. We therefore overrule the Chapas' first issue.

## C. Bystander Claim

 A bystander claim falls within an exception to the general rule barring recovery for negligent infliction of emotional distress. *Cavanaugh v. Jones,* 863 S.W.2d 551, 554 (Tex.App.–Austin 1993, writ denied) (bystander theory of recovery is one type of claim of negligent infliction of emotional distress). Under this legal theory, mental-anguish damages are recoverable for the contemporaneous sensory perception of a serious or fatal injury to a close relative. *Boyles,* 855 S.W.2d at 597–98. When the material facts are undisputed, the question of whether a plaintiff is entitled to recover as a bystander is a question of law. *United Servs. Auto. Ass'n v. Keith,* 970 S.W.2d 540, 542 (Tex. 1998) (per curiam).

 To determine whether a plaintiff has a valid bystander claim, courts consider:

(1) Whether the plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it.

(2) Whether the shock resulted from a direct emotional impact upon the plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.

(3) Whether the plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Freeman v. City of Pasadena,* 744 S.W.2d 923, 923–24 (Tex.1988) (adopting the "bystander" elements set forth in *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 920 (1968)). Here, the material facts are undisputed, but the parties disagree about whether these facts satisfy the second element of the test.

The Chapas argue that Maria, who was out of sight of the Expedition for only about 30 seconds, was a contemporaneous observer of the "accident." They further contend that Chambers's act of removing the vehicle and the children constituted a continuing tort; thus, Maria's observation of their absence renders her a bystander. *See Landreth v. Reed,* 570 S.W.2d 486, 490 (Tex.Civ.App.–Texarkana 1978, no writ) ("[A]ctual observance of the accident is not required if there is otherwise an experiential perception of it, as distinguished from a learning of it from others after its occurrence."). *But see Robinson v. Chiarello,*

compensation case using statutory definitions without requirement of causation); *Duty v. Gen. Fin. Co.,* 154 Tex. 16, 18, 273 S.W.2d 64, 64 (1954) (mental and physical injuries were wilfully and wantonly inflicted); *St. Louis Sw. Ry. Co. v. Alexander,* 106 Tex. 518, 521–22, 172 S.W. 709, 710 (1915) (wilful tort); *Hill v. Kimball,* 76 Tex. 210, 215, 13 S.W. 59, 59 (1890) (tenant miscarried after landlord committed two bloody assaults in her presence; court allowed recovery for mental anguish if accompanied by physical manifestation); *Cavitt v. Jetton's Greenway Plaza Cafeteria,* 563

S.W.2d 319, 323–24 (Tex.Civ.App.–Houston [1st Dist.] 1978, no writ) (sight of roach in food aggravated preexisting stomach ailment); *Cowden Cab Co. v. Thomas,* 425 S.W.2d 886, 889 (Tex.Civ.App.–Fort Worth 1968, writ ref'd n.r.e.) (Chapas rely on language taken from a jury charge in a waived point of error); *Sutton Motor Co. v. Crysel,* 289 S.W.2d 631, 633–34 (Tex.Civ.App.–Beaumont 1956, no writ) (passenger in car accident developed neurosis requiring hospitalization).

806 S.W.2d 304, 310 (Tex.App.–Fort Worth 1991, writ denied) (phrase "contemporaneous perception of the accident" contemplates a sudden and brief event causing injury). But on this record and under existing law, we cannot say that the requirements for bystander recovery have been satisfied.[20]

In applying "bystander" law, Texas courts have implicitly recognized a fundamental distinction between the perception of circumstances that would strike fear into the heart of a close family member, and the relative's first-hand observation that those fears have been realized. *See, e.g., Boyles,* 855 S.W.2d at 597–98 (discussing "the right of bystanders to recover emotional distress damages suffered *as a result of witnessing a serious or fatal accident* ") (emphasis added); *Gen. Motors Corp. v. Grizzle,* 642 S.W.2d 837, 842 (Tex. App.–Waco 1982, writ dism'd) ("A mother may witness a violent collision in which her child is involved, but if the child emerges unharmed, there is no sensory perception and no mental injury."). This distinction was tacitly acknowledged before the Texas Supreme Court adopted the current test for bystander recovery in 1988.[21] For example, in *City of Austin v. Davis,* a father arrived at the hospital where his neurologically impaired son was a patient and discovered that his son was missing. 693 S.W.2d 31, 32 (Tex.App.–Austin 1985, writ ref'd n.r.e.). The patient's father and the hospital staff searched the hospital, grounds, and surrounding areas for three hours before the father discovered his son's body at the base of ten-story airshaft. *Id.* at 32–33. In recognizing the father's right to recover as a bystander,

the Third Court of Appeals did not base its decision on the father's discovery that his son was missing, but instead relied on the father's first-hand discovery of his son's death. *Id.* at 34 (explaining that the father "was intensely involved in the search and subsequent discovery of his son. He did not learn of the incident from others, but found his son's body at the bottom of the airshaft."); *see also Freeman,* 744 S.W.2d at 924 (indicating that a contemporaneous observation includes a parent who "experience[s] the shock of unwittingly coming upon the accident scene.").

Such cases illustrate the distinction between the perception of circumstances that would cause a parent intense fear and uncertainty regarding a child's well-being and actually witnessing the realization of such fears first-hand. According to the summary-judgment evidence, Maria was traumatized because the sight of the empty street caused her to think her children had been kidnapped or murdered. But that fear was not realized: these were not the events that caused the children harm. Moreover, Maria was traumatized by that fear as soon as she saw the empty street *regardless* of whether her children suffered any harm at all. Her distress did not arise from witnessing the children's serious injury or death, but instead, resulted from her lack of information as to their location or condition

■ Maria Chapa unquestionably experienced fear and shock when she observed an empty street where her vehicle should have been. Although the elements of a bystander claim are applied flexibly

---

20. *See Keith,* 970 S.W.2d at 542 (mother who arrived at accident scene while rescue operations were underway and witnessed her daughter's pain and suffering was not a bystander, because she did not hear or see the accident); *Hewitt v. Chadwick,* 760 S.W.2d

333, 334 (Tex.App.–Texarkana 1988, no writ) (holding that parents who did not contemporaneously perceive the event that caused their child's injury are not bystanders).

21. *See Freeman,* 744 S.W.2d at 923–24.

and on a case-by-case basis,[22] this case presents an important disjunction between the alleged cause of injury to the primary victim—*i.e.,* the "accident"—and the circumstances observed by the relative. Texas courts have reserved recognition of bystander claims for those cases in which the emotional impact results from a sensory and contemporaneous observance of the accident that caused the close relative's harm. *Keith,* 970 S.W.2d at 542; *cf. Lions Eye Bank v. Perry,* 56 S.W.3d 872, 878 (Tex.App.–Houston [14th Dist.] 2001, pet. denied) (holding family members are not bystanders where they discovered, but did not witness, the removal of decedent's eyes). Here, however, the evidence is undisputed that Maria did not "sense" her children's serious injury or death; to the contrary, she admittedly had *no* knowledge of what had happened to her vehicle or her children until they were returned.[23] *Cf. Hewitt,* 760 S.W.2d at 334 (holding that parents who "did not contemporaneously perceive the injury to their daughter" are not bystanders). The requirement that a parent bystander's mental anguish "result[ ] from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident" [24] necessarily excludes circumstances in which the parent saw nothing, heard nothing, does not know what happened to the child, and does not know if the child is injured.[25] Here, Maria seeks to recover not for a terrible injury to her children that she witnessed, but for her fear of not knowing where they were or whether they were seriously injured.

On this record, we conclude that the second requirement of the bystander test has not been satisfied. *Cf. Freeman,* 744

---

22. *Keith,* 970 S.W.2d at 542 (citing *Freeman,* 744 S.W.2d at 924).

23. The parties dispute the length of time that the children were gone. Maria Chapa contends that Chambers did not return for fifteen or twenty minutes, and Chambers contends that five minutes is a closer approximation. Because this appeal concerns summary judgment, we construe the facts in favor of the Chapas as the non-movants.

24. *Dillon,* 69 Cal.Rptr. 72, 441 P.2d at 920.

25. After Chambers returned the vehicle, Maria learned of the "accident" and the condition of her children, but she acquired this knowledge from others. She did not witness the accident or the injuries, but learned of them from her children after the occurrence. This is exemplified in Maria's testimony:

A: I was still crying. I was still hysterical. *I saw a truck coming this way but I didn't know it was mine* because my truck was facing this way, like I said. So as it approached me, he [Chambers] came—he came down and he gave me the keys and all I told him, I said, Why did you do this *to me?*

Q: What did he tell you?

A: He said, I'm sorry, ma'am, and he left off.

Q: *What did your children tell you had happened?*

A: *That a wrecker truck had taken them.*

Q: Did they tell you anything else about it? Did they tell you whether or not the driver spoke to them, did they say anything like that to you?

A: Yes.

Q: What did they tell you?

A: They didn't tell me. They told whoever it was there because, again, at the moment I was—I was very nervous. I was crying. I was feeling light-headed, dizzy. My side was feeling numb. *But I recall them talking to a police officer and told them that the guy took them somewhere around the corner and they were waving their hands and screaming and yelling at that man so he realized that they were inside the truck because apparently he didn't know they were in there.*

Q: *From what your children explained to you—*

A: Yes.

Q: *—it appeared to them* as that as soon as the driver realized—

A: Yes.

Q: —they were in the vehicle, he returned the vehicle?

A: Uh-huh.

(emphasis added).

S.W.2d at 923–24 (contrasting contemporaneous observation with *"learning of the accident from others after its occurrence."*). We therefore overrule the Chapas' second issue.[26]

### D. Global Challenge to Summary Judgments on Evidentiary Grounds

In their third issue, the Chapas assert that the trial court erred in granting traditional and no-evidence summary judgments dismissing all of Maria and Carlos Chapa's claims. They argue there is sufficient evidence to defeat summary judgment on claims of common-law negligence, negligent hiring, and damages, including mental anguish and loss of consortium. In support of these arguments, the Chapas rely primarily on the same arguments advanced in support of their theories of liability under the Business and Commerce Code and the Restatement (Second) of Torts. As with those claims, the Chapas identify no injuries that are compensable on this record and under existing law.[27] We therefore overrule the Chapas' third issue.

### V. CONCLUSION

On this record, the Chapas' claims for mental anguish and its physical manifestations do not constitute compensable injuries under existing law addressing section 9.609 of the Texas Business and Commerce Code, sections 424 or 427 of the Restatement (Second) of Torts, or the common-law of negligence, including claims of bystander injury and negligent hiring. We therefore affirm the judgment of the trial court.

---

26. Traciers and Chambers also moved for no-evidence summary judgment on the ground that the children were not "physically injured," and Ford asserted that the children were not "seriously" injured. In light of our conclusion that the mental anguish experienced by the Chapa's is independent of any injury to the children, we do not reach the alternative grounds asserted in the motions for summary judgment.

27. Regarding the claim of negligent hiring, the Chapas also failed to identify any connection between Chambers's prior criminal background and his mistaken judgment in this case.