CARNEY, Justice.
I. INTRODUCTION
Two debtor limited liability companies (LLCs) executed security agreements in favor of two creditor LLCs, giving the creditor LLCs security interests in three airplanes. Disputes arose when the creditor LLCs, considering the debtor LLCs in default, took possession of two airplanes and removed and retained parts of a third airplane. After a bench trial the superior court entered judgment against the debtor LLCs and an individual associated with both of them. The debtor LLCs and the individual appeal, raising issues about default, seizure of collateral, and post-seizure notice; the individual also questions the judgment against him personally. We affirm in part, reverse in part, and remand for further proceedings.
II. FACTS AND PROCEEDINGS
A. Facts
1. Businesses involved in the dispute
The debtor LLCs in this litigation are Wingnuts Aviation, LLC (Wingnuts) and Knik Aircraft Leasing, LLC (Knik), both aviation-related LLCs. Brett Crowley was a member of both LLCs. Wingnuts operated a flight school that was, for most of the time relevant to this case, based at the Palmer Airport. Knik was organized to buy airplanes that Wingnuts could lease. Each debtor LLC had one other member: the other member of Wingnuts was Tara Chesnut, and the other member of Knik was Richard Walker, who also operated a separate aviation-related business.
The creditor LLCs involved in this litigation are Northern Aviation, LLC (Northern) and NA Holdings, LLC; Jeffrey Helmericks is the sole owner of Northern and NA Holdings. Northern leased, maintained, and sold aircraft. NA Holdings offered "fuel, tie-down spaces, aircraft maintenance," and "[b]asic aviation support." All of the businesses involved in the litigation operated at the Palmer Airport.
2. The Cessna loan
On July 1, 2013, Knik signed purchase agreements related to two Cessna airplanes, one agreement with Northern and one with N8681U, "a sub-LLC of Northern Aviation at the time." The purchase agreements required Knik to make a 20% down payment on each aircraft, with the purchase to be completed in ten days. Because Knik was not able to obtain outside financing, Northern agreed to lend $ 72,000 to Knik, and on July 10, Knik *410 signed loan and security agreements for financing the Cessna airplanes. Helmericks obtained both contracts from an internet site. The loan agreement included a guaranty provision under which Crowley and Walker both "unconditionally guarantee[d]" Knik's obligations.
The loan agreement set out a payment schedule over 15 years, recited that the loan was secured by the Cessnas, and listed events that would be considered default by Knik, including "a default in any security agreement which secures this [n]ote." The security agreement identified the two Cessna airplanes as collateral and gave Northern a security interest in them. It required Knik to "maintain insurance at all times with respect to all collateral against risks of fire, theft, and other such risks and in such amounts as [Northern] may require" and to "make all repairs ... necessary to maintain any [c]ollateral in good working order and condition." The default provision of the security agreement specified that Knik would be in default "upon any non compliance with or non performance of [its] obligations" under the security agreement.
Knik made the down payment in mid-July. Knik's subsequent payments frequently varied from the loan agreement schedule in both amount and timing, but Northern continued to accept them. Knik's sole source of income was Wingnuts's lease payments. It is undisputed that Knik never had insurance for the Cessnas. Helmericks was aware of the lack of coverage as early as late 2013. Helmericks and Crowley discussed alternatives to commercial insurance because of its cost but disputed whether they had agreed to a specific alternative.
In November 2014 Crowley informed Helmericks that Wingnuts intended to move its operations to Wolf Lake, a location about seven miles from Palmer. Helmericks said Wingnuts could not take the Cessnas there; Crowley disagreed, and Helmericks told Crowley that Knik was in default and had been from the first month of the contract. A heated discussion that included Walker ensued. The exact sequence of actions in the Cessnas' repossession is disputed, but Helmericks, evidently with Walker's cooperation, secured the Cessnas in hangars. Helmericks agreed that Knik made another payment on the Cessna loan the following month. Northern later sold one Cessna, and at the time of trial the other Cessna was apparently still in Northern's possession. The record does not contain any written agreement between Northern and Knik following Northern's possession of the Cessnas, nor is there any type of written notice from Northern to either Knik or Crowley. At trial Crowley contended Knik had overpaid its obligation and was owed money on the Cessna loan.
3. Contracts between Wingnuts and NA Holdings
Wingnuts and NA Holdings entered into two written contracts and had an ongoing business relationship that resulted in Wingnuts incurring a debt to NA Holdings.
Wingnuts entered into a one-year lease with NA Holdings on July 1, 2013, agreeing to rent office space and outside parking for up to four aircraft at the Palmer Airport. The lease, obtained from an internet site, required arbitration of any "controversy or claim relating to this contract."
Wingnuts also bought fuel from NA Holdings, often on credit. NA Holdings sent Wingnuts statements that included not only the fuel costs but also Wingnuts's rent and what appear to be charges for renting aircraft. Wingnuts fell behind in payments.
Ultimately, "Bret[t] Crowley, DBA Wingnuts Aviation" signed a loan document and a security agreement related to the delinquent account with NA Holdings. Crowley signed the loan agreement in early May 2014, with a principal amount of just over $ 38,800; monthly payments were to be made over five years. The agreement contained a guaranty that Crowley and Wingnuts "unconditionally and personally guarantee[d] all the obligations of the [b]orrower under this [n]ote." The security agreement gave NA Holdings a security interest in a Mooney airplane stated to be owned "free and clear" by Chesnut and Crowley. The security agreement required Wingnuts to "keep the collateral free from unpaid charges, taxes, and liens," to maintain insurance, and to make all repairs needed to *411 keep the collateral "in good working order and condition."
Wingnuts continued to buy gas on credit from NA Holdings after the parties signed the loan agreement secured by the Mooney airplane. The parties refer to this ongoing debt as the "net 30" account. As of late October 2014, the unsecured net 30 account had a balance of a little less than $ 18,500 and was unsecured.
In August 2014 a student and Crowley did a "gear-up" landing at the Wasilla Airport in the Mooney. The Mooney sustained damage to its propeller and body, and Wingnuts missed its September 2014 payments. Neither Crowley nor Wingnuts took steps to repair the Mooney promptly.
Discussions between Crowley and Helmericks became less cordial in the following months, although the cause of the friction was disputed. Helmericks indicated he was fed up with Crowley and Wingnuts, but Crowley contended that Helmericks had inappropriately disclosed Crowley's personal financial information and also hoped to prevent Wingnuts from moving its operations to Wolf Lake where Chesnut's father had purchased a hangar.
In October 2014 Crowley and Helmericks exchanged numerous text messages related to finances. The interpretation of the text messages was disputed, as set out more fully below. On October 23 Crowley made a $ 19,000 cash payment to one of Helmericks's businesses. The payment's disposition was also disputed: Helmericks applied the cash first to the net 30 account and then credited the balance to the loan secured by the Mooney; Crowley insisted he directed the payment to the Mooney-secured loan. In November 2014 Crowley informed Helmericks that Wingnuts intended to move its base of operations to Wolf Lake. On December 2, 2014, Wingnuts gave NA Holdings written notice that it was vacating its office space at the Palmer Airport as of January 1, 2015.
The Mooney remained at the Wasilla Airport without its propeller, and in June 2015 Helmericks removed the radio (or avionics) - the terms are used interchangeably in the record - from the Mooney and took the equipment to his office. According to Helmericks he visited the airport to look at the plane and observed that someone had attempted to tape the window shut with duct tape but the tape had weathered over the winter. He said the door was unlocked - Crowley disputed this - so he entered the plane and removed the avionics. Someone reported the removal of the avionics to Crowley, who contacted the police, who in turn contacted Helmericks. According to Crowley, Helmericks told the police that he had the equipment in his office and that he had removed it through the window of the plane.
In early November 2015 Chesnut completed an Application for Airworthiness Certificate in an apparent attempt to get the Mooney repaired. According to Crowley the permit was intended to get the Mooney to Wolf Lake so Wingnuts's mechanic could fix it. Crowley intended to put a propeller on the plane and fly it to Wolf Lake later that month. At about this time Helmericks removed the engine from the Mooney and placed it with Walker, where it remained at the time of trial. Helmericks testified that rather than litigate the return of the avionics, he "opted to leave them ... in the cupboard, where they were secure," and he agreed that his position at trial was that he would release the engine and avionics to Crowley or Wingnuts if the debt was paid in full. The City of Wasilla impounded the Mooney in December 2015 because of unpaid fees. According to NA Holdings's closing argument at trial, the City of Wasilla intended to dispose of the Mooney.
B. Proceedings
1. Complaints and answers
In February 2015 Crowley, in his individual capacity and through counsel, sued Northern for breach of contract and several other causes of action based on the business transactions between Knik and Northern. Northern answered the complaint.
In early April 2015 Northern as a defendant and NA Holdings as a third-party plaintiff filed a motion under Alaska Civil Rule 14 to allow a third-party complaint against Knik, *412 Wingnuts, and Crowley individually.[1] Shortly after the motion was filed, Crowley's attorney withdrew, citing a conflict of interest, and Crowley began to represent himself. The court granted the motion to allow the third-party complaint in June. The third-party complaint set out three different breach of contract claims: one for the Cessna transactions, one for the lease agreement, and one for the Mooney-secured loan. The fourth cause of action was for "delivery" of the Mooney. No summons was issued related to the third-party complaint.[2] Copies of the contracts were attached to the third-party complaint, but the complaint itself did not set out a cause of action against Crowley as an individual and only mentioned the Cessna loan guaranty.
Another attorney entered an appearance on behalf of Crowley in early August. Crowley and Wingnuts, through counsel, answered the third-party complaint against them in April 2016 and asserted several affirmative defenses, including the illegality of the repossessions.[3] Wingnuts brought several counterclaims,[4] including breach of contract, replevin, interference with a prospective economic advantage, and conversion against Northern and Helmericks individually, but it did not bring a cross-claim against Knik.[5] The counterclaims mostly concerned actions taken with respect to the Mooney, although the factual allegations included Northern and the repossession of the Cessnas. Helmericks was not formally joined as a party, nor did anyone attempt to join Walker as a party.[6] Northern answered the counterclaims. In later pleadings, the attorney representing Northern and NA Holdings indicated that he represented Helmericks as well, although he never formally entered an appearance. His closing argument asked the court to award Helmericks and his businesses "the entire amount of damages they have incurred."
2. Relevant motion practice
At the beginning of the case in early April 2015, Crowley, still represented, filed a motion under Alaska Civil Rule 88 for the Cessnas' return, arguing that he was not in default on the loan agreement because, even though his payments had not been regular, he had paid more on the account than he owed up to the time of repossession and had in fact made a loan payment after the repossession. Northern opposed the motion and raised as a defense Crowley's lack of standing to assert Knik's rights. At the hearing on the motion, the trial court noted Northern's objection but allowed Crowley to proceed for purposes of the hearing in an effort to ascertain whether he (or Knik) had any colorable claim for the aircraft. At the conclusion of the hearing the court denied Crowley's motion because he had not met his burden of showing either the probable validity of his claim to the property or the "absence of any reasonable probability that a successful defense [could] be asserted"[7] by Northern.
In early July 2015 Northern filed a motion for summary judgment on all of the claims in *413 Crowley's complaint based on lack of privity, arguing that the contract underlying the original complaint was between Northern and Knik, not Crowley individually; because he was not a party to the contract, Northern argued, Crowley could not assert in his individual capacity any of the claims made in his complaint. The trial court notified the parties in October 2015 that it intended to grant the motion for summary judgment but, recognizing that Crowley had been self-represented for several months while the motion was pending, it gave him 15 more days to file an opposition. Crowley, through counsel, ultimately responded that he would "not assert a personal breach of contract claim," noted that Northern had filed a third-party complaint against Knik, and concluded that he did not oppose summary judgment. He argued the summary judgment motion should affect "only Count I, and possibly Count II" of the initial complaint and represented that he would "in short order" submit "a pleading cleaning up his claims." The court then gave the parties notice that it intended "to grant summary judgment dismissal" on all counts in the initial complaint unless Crowley filed an opposition or amended his pleadings by mid-March 2016. When Crowley did neither, the court granted summary judgment and dismissed all claims in Crowley's initial complaint.
In July 2015 NA Holdings asked the court to order delivery of the Mooney to it pursuant to the security agreement. At the same time Northern asked the court to order Crowley to deliver the logbooks and keys to the Cessnas as well as "any additional documents required for registration" of those aircraft. In October 2015 the court issued an order inviting NA Holdings and Northern "to resubmit the affidavits attached to these motions to correct deficiencies" in them. They never did. In late October the parties stipulated that the logbooks, keys, and registration to the Cessnas were in Northern's possession. Apparently nothing else was filed related to the Mooney because the trial court deemed the motion related to the Mooney moot in January 2016.
3. The trial
The trial court held a bench trial over three days in June 2016. Helmericks, Crowley, Chesnut, and Helmericks's son Brandon, who kept the books for the businesses and generally kept track of business during the winter, were the only witnesses. Because the parties did not clearly segregate their business transactions related to the various contracts, the evidence presented at trial at times was relevant to more than one cause of action.
The trial testimony suggested that the parties did not strictly adhere to the written contracts they had made. For example, the parties agreed they had discussed alternatives to the insurance requirement for the Cessnas: Helmericks testified that the cost of commercial aviation insurance was "almost prohibitive," so instead of insurance he would be satisfied with a CD in Northern's name in the amount of the loan balance or with Crowley putting some of Chesnut's "securities" in a similar arrangement. Crowley understood that no insurance was required but that he, Wingnuts, or Knik would be responsible for any damage to the Cessnas. He said that based on his conversations with Helmericks, he did not think he ever needed "independent third-party insurance." There is also ample evidence in the record that Northern accepted late payments and partial payments from both Knik and Wingnuts.
With regard to the loan and repossession of the Cessnas, the parties disputed whether Knik was in default at the time of the repossession. Helmericks testified that Knik was in default by not having any insurance on the Cessnas, by improperly using the planes, by failing to maintain the aircraft, and by not making loan payments on time. He said that "[t]he deficiency with the loan - with the payments was their ... irregularity, not their amount." Crowley testified that: (1) Knik overpaid the amount due on the loan as of December 2014; (2) Northern waived the insurance requirement; and (3) Knik properly maintained the aircraft. Crowley did not dispute that Knik had not consistently adhered to the payment terms of the loan, but he noted that Northern continued to accept payments without objecting and in fact accepted *414 a payment after it took possession of the Cessnas. Helmericks acknowledged that Northern was inconsistent in charging late fees and agreed that Crowley, evidently through Wingnuts, had made an additional payment on the Cessna loan on behalf of Knik in December 2014, after the planes were in Northern's possession. Helmericks indicated he was aware of conflict within Knik between Crowley and Walker about "the direction the business was going" when Walker assisted Helmericks in securing the Cessnas. Although Helmericks first said there was a balance remaining on the Cessna loan, he later agreed that Northern had not been damaged by any of the breaches of the Cessna contracts, calling the claimed damages of over $ 8,000 in his businesses' trial brief "an error."
With respect to the disputes between Wingnuts and NA Holdings, the parties offered sharply conflicting testimony about the allocation of the $ 19,000 payment Crowley made in late October 2014. At that time Wingnuts was not current in the Mooney-secured loan payments and owed more than $ 18,000 on the net 30 account. Crowley contended that he instructed NA Holdings to use the $ 19,000 for the Mooney-secured loan, effectively prepaying the loan through sometime in 2016.[8] He evidently did not intend any of the funds to apply to the net 30 account balance. Two invoices dated October 24, 2014 show that on October 23, $ 18,430.63 was credited to the net 30 account and $ 569.37 was credited to the Mooney-secured loan account. Helmericks testified that Crowley and Wingnuts owed $ 42,678.34 on the Mooney-secured loan at the end of May 2016.
Helmericks and Crowley, in rebuttal and surrebuttal, offered into evidence a series of text messages they had exchanged relevant to the debts and this cash payment. On October 18 Helmericks texted to Crowley: "Loan Balance As of today, October 18th: Airplanes $ 69,538.18 Loan $ 37,626.04[.] Apply payments to the open net 30 account first, the unsecured debt next and the secured debt last. Any questions, text or call me." (Emphasis in original.) According to Crowley, this text message was sent to both Crowley and Brandon. Brandon, the bookkeeper for NA Holdings, said he usually took direction from Crowley about how payments were to be applied to the different accounts and agreed that the allocation of the payment to the net 30 account first was not an agreement Crowley had with him directly. The next day Crowley texted only to Helmericks, "All of the cash has not come in yet. I am going to start with the outstanding balance for Wingnuts and Knik. Then hopefully Wednesday or Thursday we will get the two loans done. I'm sorry for the delay, but I haven't even gotten the cash yet."
The parties then texted about a payment on the Cessnas, and on October 23 Helmericks texted Crowley, "Do you have a timeline for the two loan payoffs yet?" Crowley responded that he would talk to Helmericks the next day. On October 28 Crowley texted Helmericks that he had deposited $ 19,000 in Helmericks's account. After some back and forth about whether the deposit had actually been made, Helmericks informed Crowley that the bank "found it" and told Crowley that the problem with payments was "one of the primary reasons [he couldn't] continue funding [Crowley's] venture."
Helmericks initially disputed the existence of the October 18 text; he asserted that the October 19 text message from Crowley referred to the allocation of the $ 19,000 payment. Helmericks testified that "the two loans" referred to the Mooney-secured loan and the Cessna loan. He agreed that this text "confirmed" his position that the "revolving account was to be paid first." In contrast Crowley interpreted his statement in the October 19 text that he was "going to start with the outstanding balance for Wingnuts and Knik" as an instruction to Helmericks to apply the money to the two secured loans first and not to the net 30 account as Helmericks *415 had proposed in the October 18 text. Crowley points to no testimony or other evidence indicating he complained to NA Holdings about the allocation of the large cash payment at that time, and the record indicates that Wingnuts made another payment on the Mooney-secured loan in November 2014.
Helmericks and Crowley also disagreed about how to characterize the removal of the engine and the avionics from the Mooney. Helmericks denied that he ever repossessed the Mooney, asserting that he was protecting the collateral when he took these parts of the plane. Crowley called it a repossession. The parties apparently agreed that neither Northern nor NA Holdings gave any written notice prior to or after the repossessions; there is no documentation of any written notice in the record. And Helmericks indicated that the avionics remained in his office and the engine remained in Walker's hangar, apparently under Helmericks's control. Helmericks offered no testimony that he had attempted to sell the seized parts; instead, he agreed he would return them to Crowley if Wingnuts paid whatever it owed to him under the loan agreement.
The parties submitted simultaneous written closing arguments and rebuttals. Crowley's attorney included arguments on behalf of Knik as well as Wingnuts and Crowley, and the attorney who represented Helmericks's LLCs filed a written closing on behalf of Northern, NA Holdings, and Helmericks individually. Helmericks did not object to Crowley's attorney making a closing argument on behalf of Knik; he responded substantively to the arguments.
In closing Northern summarily argued that Knik breached its contracts with Northern and that Northern was damaged by the breaches, although it did not identify any damages and argued that Northern had mitigated damages "following its repossession of the planes, and therefore did not present additional evidence related to post-repossession damages." Northern asked for an award of nominal damages. NA Holdings asked for damages related to the lease agreement as well as $ 42,967.87 for the Mooney-secured loan; it argued that it had properly allocated the $ 19,000 cash payment. Finally Helmericks asserted the Mooney might have "little value" in light of the fees charged by the City of Wasilla but asked the court to transfer title to the Mooney to him in light of "liabilities associated with the possession of the abandoned aircraft."
Crowley and his LLCs argued that Knik was current in its payments and not only was not in default of the loan agreement at the time Northern took possession of the Cessnas but in fact had overpaid its obligation. As to the security agreement, Crowley argued that Helmericks had waived the insurance requirement and had presented no evidence that Knik failed to maintain the Cessnas. Wingnuts pointed to the lease's arbitration clause and asked the court to dismiss the claim. Wingnuts argued that Crowley had directed the $ 19,000 cash payment to be applied to the Mooney-secured loan, relying on the text messages and what he called a "historical understanding and practice of how payments were prioritized." Wingnuts concluded that it was not in default of the loan agreement in either November 2014 or June 2015, and it argued that Helmericks's seizure of the engine and avionics were thus impermissible.
Wingnuts set out the evidence presented about its attempts to have the Mooney repaired, including the application to allow it to fly the plane to Wolf Lake for repairs. It denied that the Mooney had been "abandoned" and asked the court to take judicial notice that as of June 2015, when Helmericks removed the avionics from the Mooney, he had already asserted a judicial claim for the Mooney and "[t]he matter was then before th[e] [c]ourt." Wingnuts also contended that abandonment was "not a specified basis for executing the Security Agreement" and that the seizure of the avionics "not only rendered the plane inoperable ... but was both improper and illegal."
The court issued its decision in December 2016, concluding it had no jurisdiction over the lease dispute because of the mandatory arbitration clause. The court found that Crowley disputed the legality of the repossession of the Cessnas and claimed damages on behalf of Wingnuts, but "offered no evidence *416 that in fact Wingnuts was damaged." It faulted Wingnuts for failing to include Knik as a co-defendant in the action it had brought against Helmericks and Northern and for neglecting to provide evidence about Walker's authority to act on behalf of Knik. The court found that the testimony showed Helmericks did not waive the requirement for insurance and "expected Knik to at a minimum buy a CD in Northern Aviation's name or pledge sufficient securities."
The court observed that the security agreement "states that notice shall be in writing if required,"[9] and cited a provision from AS 45.29 that the superior court said "require[d] notice prior to disposition of property seized pursuant to AS 45.29.609." The court found that Crowley did not "claim harm due to the lack of notice" and decided the lack of statutory notice was "harmless in this sequence of events." The court did not discuss Crowley's claim that Knik had overpaid on the loan and was thus owed money.
The court found that Northern failed to produce evidence that Knik had not maintained the aircraft, and it further found that Knik was current in its payments at the time of repossession. It found that Northern failed to show any damages arising from a breach of the contracts related to the Cessnas and that Walker's conduct in assisting to secure the Cessnas mitigated any potential damages. The court held that Northern met its burden of showing that Knik had breached the security agreement by not insuring the Cessnas but concluded that Northern "failed to show that Knik breached the loan or security agreement due to late payments or a failure to maintain the aircraft."
Turning to NA Holdings's claims against Wingnuts, the court interpreted the text messages in a way that neither party had advocated. The court decided that Crowley's intent was to allocate enough of the payment to the Mooney-secured loan to make it current, thereby curing Wingnuts's default. After that, the court decided, Crowley intended to direct the remainder of the $ 19,000 to the net 30 account. Of the $ 19,000, the court allocated $ 2,580.82 - the amount it determined that Wingnuts was in arrears - to the Mooney-secured loan. The court calculated the amount due on the Mooney-secured loan but did not appear to base its calculations on evidence in the trial record; the court cited an exhibit to which both parties referred at trial but which was not admitted as evidence. The court found that NA Holdings "had a right to seize the radios and engine pursuant to AS 45.29.609" and found that "any failure to comply with the notice requirement" of AS 45.29 was either "irrelevant or harmless."
The court further decided that NA Holdings could recover damages of over $ 33,000 and that it was "legally entitled to the possession and ownership of the Mooney to satisfy the remaining debt owed by Wingnuts." It ordered NA Holdings to comply with the notice requirements of AS 45.29 in its disposition of the aircraft and parts. The court found against Wingnuts and Crowley on all of their counterclaims and entered final judgment for over $ 33,000 plus interest in favor of NA Holdings and against Wingnuts and Crowley (individually); it issued a declaratory judgment awarding NA Holdings title to the Mooney. The court did not explain the basis for its entry of judgment against Crowley as an individual, simply saying in a footnote, "The judgment will also enter against Brett Crowley in his individual capacity."
Wingnuts, Crowley, and Knik appeal.
III. STANDARD OF REVIEW
We review a superior court's findings of fact under the clearly erroneous standard; a finding of fact is clearly erroneous if after reviewing the record we are left with a definite and firm conviction that a mistake has been made.[10] Under Alaska Civil Rule 52(a), the superior court is required to make findings of fact and conclusions of law; those "findings and conclusions should be so clear and explicit as to give [this] Court a clear understanding of the basis for the decision *417 made."[11] When the superior court's findings are inadequate, we remand the case for further findings.[12] "Questions regarding the interpretation and application of a statute are questions of law to which we apply our independent judgment."[13]
IV. DISCUSSION
A. The Superior Court Did Not Clearly Err In Finding That Knik Was In Default And That Failure To Provide Notice Before Repossessing The Cessnas Was Harmless.
On appeal Knik contends that the superior court erred in finding that Knik breached the security agreement by failing to insure the Cessnas. It argues that Northern, through its sole member, Helmericks, waived the insurance requirement and thus waived its ability to repossess the aircraft on that basis. Knik further contends that Northern was required to provide written notice of the alleged breach before it could rightfully repossess the Cessnas. In response Northern maintains that Crowley cannot assert claims on behalf of Knik (as the superior court decided[14] ) and that even if he could, the superior court's finding that there was a breach of the security agreement is not clearly erroneous. Northern does not discuss the notice issue.
Knik's status in the trial court is difficult to discern because Knik was never served with a summons and complaint and never answered or formally appeared in the trial proceedings, even if it may have been included in closing argument.[15] But judgment was entered against Knik, and its status in this appeal is not ambiguous. The notice of appeal filed in this court lists Knik as an appellant and shows that it is represented by the same attorney who represents Crowley and Wingnuts. Knik clearly can appeal a judgment entered against it under these circumstances.
The trial court determined that Helmericks acted with Walker's consent when he took possession of the Cessnas. Walker, one of the members of Knik, actively participated in the surrender of at least one Cessna to Northern. Crowley did not explicitly argue in the superior court, and neither he nor Knik argues on appeal, that Walker lacked the authority to act on Knik's behalf in surrendering the Cessnas. Knik asserts on appeal that it does not seek return of the collateral. Because Knik does not seek return of the Cessnas and because Crowley and Wingnuts did not appeal the superior court's decision that they failed to prove any of their claims against Northern (or their putative claims against Helmericks), we agree with the superior court that failure to give any notice before action on the alleged default in this case was harmless.[16]
Turning to Crowley's argument that Knik was not in fact in default and his consequent argument that Northern had no right *418 to possession of the Cessnas,[17] Crowley presented no evidence that Knik had ever insured the Cessnas; his defense was that Helmericks did not insist on insurance coverage. But Crowley also failed to show that Knik complied with any of the alternatives to commercial insurance that Helmericks claimed the parties had discussed. The trial court resolved any conflict between his testimony and Helmericks's in favor of Helmericks. As a result, we affirm the superior court's determinations that Knik breached the security agreement by failing to insure the Cessnas and that any failure to give notice before repossessing the Cessnas was harmless.
B. It Was Error Not To Address The Question Of An Overpayment On The Cessna Loan And To Find That Northern's Failure To Give Notice Of Disposition Was Harmless.
In the final judgment, the superior court cited parts of the Uniform Commercial Code (U.C.C.) - Secured Transactions,[18] in particular the provision mandating notice before a secured creditor disposes of collateral in its possession.[19] The court wrote that Helmericks agreed he had not provided any written notice and that Crowley did "not claim harm due to the lack of notice." It then found that the lack of written notice was more likely than not harmless. The superior court never addressed Crowley's argument that Northern owed Knik money for the Cessna loan.
Because neither party mentioned the statutory sections related to secured transactions in the trial court, the superior court did not have the benefit of the parties' advocacy to better understand the impact of the law on this case.[20] While the superior court applied to this case parts of AS 45.29.101 - .811, as set out more fully below, its finding that Northern's failure to give notice of disposition of the collateral was harmless error lacks evidentiary support and must be reversed.
Alaska Statutes 45.29.611 - .613 prescribe the notification requirements for a secured creditor to use when disposing of collateral in its possession.[21] Walker's surrender of the collateral to Northern, the secured creditor, gave Northern the authority to dispose of the collateral and apply the proceeds to the balance of the debt secured by the Cessnas.[22] Under AS 45.29.610(b), Northern was required to act in a commercially reasonable manner in "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms." Additionally, Northern was required to provide notice of disposition of the property to both the debtor (Knik) and any secondary obligors.[23] After disposition Northern was required to pay any surplus to Knik; if a deficiency remained after disposition of the collateral, Northern could bring an action for a deficiency judgment.[24] We have previously discussed the consequences of failing to provide proper notice prior to disposing of collateral: when a secured creditor fails to comply with statutory notice requirements, a presumption exists in a later deficiency action that the collateral's *419 value is at least equal to the amount of the outstanding debt.[25]
While Northern's third-party complaint did not clearly set out a claim for a deficiency judgment, by the time of trial Northern had disposed of at least one Cessna but still sought damages of over $ 8,000 - in other words, Northern apparently sought a deficiency judgment.[26] Northern also made allegations related to Crowley's status as a guarantor under the Cessna loan agreement in its third-party complaint. Crowley, in contrast, claimed that Knik was not in default as to payments at the time Walker surrendered the Cessnas and that Northern in fact owed Knik money because of payments made after repossession of the Cessnas. The superior court agreed with Crowley that Knik was not in default in payments at the time Northern took possession of the planes and decided Northern had not shown a breach of the agreement by failing to maintain the aircraft. But the court made no findings about Crowley's assertion that Northern owed Knik money.
Knik and Crowley contend that the superior court erred in failing to order Northern to provide some type of accounting about any surplus or deficiency resulting from disposal of the collateral because Crowley presented evidence at trial that he or Knik made payments on the Cessna loan after the planes were repossessed. Knik and Crowley also argue that the superior court erred in finding lack of notice harmless. Northern maintains only that Crowley cannot assert arguments on behalf of Knik, contending that Crowley's guaranty "does not give him the ability to assert claims against [Northern]"; it does not respond to arguments about the application of AS 45.29.
Northern's argument is not detailed, but its position that Crowley, as guarantor, cannot assert claims against Northern may be incorrect. We assume that Northern intended to obtain a judgment against Crowley individually in his capacity as a guarantor of the Cessna loan; we see no other explanation for Northern's allegations related to Crowley's personal guaranty of that loan in its third-party complaint.[27] As a guarantor, Crowley may have been a secondary obligor and therefore able as an individual to assert defenses available to secondary obligors.[28] But even if Crowley is not a secondary obligor, Northern does not argue convincingly that he could not in the trial court assert defenses on behalf of Knik, one of the parties Northern sued when it filed its third-party complaint.
Northern seemingly acquiesced in the trial court to Crowley's assertion of defenses related to Knik: it did not object and offered substantive responses to arguments Crowley (or possibly Knik) made about the Cessna loan. We have already noted Knik's status as a party who was never served with a summons.[29] Northern asks that we affirm the judgment entered in this case but does not explain who represented Knik's interests at trial if Crowley did not or why it could rely on the actions of one member of Knik - Walker - to justify its possession of the Cessnas while simultaneously arguing that Crowley, the other member of Knik, cannot assert defenses to the loan on Knik's behalf.
The trial court made no findings about the disposition of the Cessnas or about Northern's application of the proceeds to the loan balance. Helmericks testified that one Cessna had been sold, evidently after some refurbishing. The record has no information about the sale price of that Cessna, the cost of any work done to prepare it for sale, or the commercial reasonableness of Northern's actions; the record is silent about the disposition *420 of the second plane.[30] With no information about the actual disposition of the collateral, it is impossible to ascertain whether Northern could overcome any presumption about the Cessnas' value and whether there was a surplus or deficiency on the loan.
There is no evidence of any written notice to Knik, Crowley, or Walker in the record, and Northern does not on appeal dispute the superior court's finding that Helmericks agreed he did not provide written notice. A debtor has an interest in ensuring that collateral is sold for as much as possible in order to minimize any deficiency, and notice of the sale can allow a debtor to help publicize the sale.[31] Additionally, both debtors and secondary obligors have a right to redeem repossessed collateral, but that right must be exercised before the creditor disposes of it.[32] Notice of disposition thus serves an important function in the repossession context. Because of the dearth of information about disposition of the planes, we are unable to evaluate whether the failure to give notice of that disposition was harmless as the superior court found.
Crowley asserted in the superior court that Knik had overpaid its loan obligation, bringing into question whether Northern owed Knik money. The superior court did not mention this argument in its decision. Because the record has virtually no information about disposition of the Cessnas, we cannot evaluate the superior court's finding that failure to give pre-disposition notice was harmless. We thus reverse the superior court's finding that Northern's failure to provide notice as required by AS 45.29.611 - .613 was harmless and remand to the superior court for further proceedings about disposition of the Cessnas and Crowley's claim that Knik is owed a surplus.
C. The Superior Court's Finding That Wingnuts Was In Default And Its Interpretation Of The Text Messages Were Not Clearly Erroneous.
Crowley and Wingnuts contend that Wingnuts was not in default on the security or loan agreements and conclude that NA Holdings had no right to possess the Mooney. They argue extensively that the superior court's interpretation of the text messages about the $ 19,000 payment was clearly erroneous. They assert that the superior court's statement that Crowley had left the Mooney "to rot" did not take into account Crowley's purchase of a propeller for the plane. NA Holdings responds that the trial court's interpretation of the text messages was correct and that it had a right to possess the Mooney.
Crowley made a $ 19,000 deposit to an account owned by one of Helmericks's LLCs in late October 2014. Crowley relies on the parties' "history ... over their several agreements," a notation on Wingnuts's bank records, and a series of text messages the parties exchanged during the two weeks before the $ 19,000 deposit to support his argument that he allocated this deposit to the Mooney-secured loan. None of these sources shows that Crowley gave clear instructions to Helmericks or NA Holdings to apply the deposit primarily to that loan. First, there is no evidence that the notation on Wingnuts's bank records was ever communicated to Helmericks or NA Holdings before Crowley made the deposit, so it cannot possibly have served as an instruction to Helmericks or his LLCs. Nor does the parties' "history" show a clear intent that the money be used to satisfy and pay forward the Mooney-secured loan; this argument relies exclusively on Crowley's testimony, but the trial court credited Helmericks's testimony over his.
Crowley's intent in allocating the payment solely to the Mooney-secured loan when he *421 sent the text messages is not, as he claims, "clear," and we disagree with his assertion that there is only one way to interpret these messages. While the superior court interpreted the text messages in a way that neither party advocated, its interpretation is not clearly erroneous. Helmericks provided Crowley with the loan balances for the two secured debts as of October 18 and indicated he would apply any payments to the net 30 account first and the secured debt last. Crowley responded that he was going to "start with the outstanding balance for Wingnuts and Knik" and then "hopefully Wednesday or Thursday we will get the two loans done." Crowley's text implies that he was waiting for more money.
The superior court interpreted Crowley's response as directing Helmericks to allocate enough money to the Mooney-secured loan to bring that loan current. The superior court noted that Crowley made a separate payment to bring Knik's loan current and reasoned that Crowley anticipated paying off the two loans from other sources. The court decided that any money remaining after the Mooney-secured loan was made current should go to pay the net 30 account. This interpretation is not clearly erroneous: it accounts for ambiguities in the messages and takes into account the background events at the time the messages were exchanged.[33]
The interpretation of the text messages was only one part of the superior court's analysis of Wingnuts's default. The superior court also discussed the "gear-up" landing in August 2014 and the subsequent delay in attempting to repair the Mooney aircraft. The security agreement related to the Mooney required Wingnuts to make all repairs necessary "to maintain [the Mooney] in good working order and condition." Even if Crowley bought a replacement propeller as he argues, he took no steps to promptly repair the Mooney. It is uncontested that the Mooney was still at the Wasilla Airport when Helmericks removed the avionics in June 2015, almost a year after the "gear-up" landing. Wingnuts was thus in breach of the security agreement's provision that the collateral be maintained "in good working order and condition" when Helmericks seized the avionics.
The superior court's finding that Wingnuts was in breach of the loan and security agreements was not clearly erroneous. The court's interpretation of the text messages and allocation of the payment was also not clearly erroneous, and Wingnuts failed to maintain the Mooney as required in any event.
D. The Superior Court Must Make Additional Factual Findings About The Repossession Of The Mooney With Respect To A Breach Of The Peace.
Crowley and Wingnuts raise on appeal the question whether Helmericks's actions in removing the avionics and engine from the Mooney constituted a breach of the peace under AS 45.29.609, making the repossession illegal. NA Holdings does not respond to this argument.
Neither party cited the U.C.C. in the superior court. Nonetheless, the superior court found that "Helmericks had a right to seize the radios and engine pursuant to AS 45.29.609." Alaska Statute 45.29.609 permits a secured party to take possession of collateral after default without judicial process "if it proceeds without breach of the peace."[34] Here the parties offered different accounts of certain facts which might prove important in deciding whether Helmericks's removal of the avionics and engine violated AS 23.30.609's directive, such as whether the plane was locked when the avionics were *422 removed.[35] With no factual determinations to review, we are unable to evaluate whether Helmericks's actions in removing the engine and avionics were done in breach of the peace.
The superior court also did not explain why removal of only parts of the collateral was commercially reasonable, despite conflicting testimony by the parties about that question, or why Helmericks's retention of the collateral with no apparent effort to dispose of it was commercially reasonable.
Because the breach of the peace issue could affect the legality of the Mooney's repossession and thus the evaluation of damages, we vacate the superior court's judgment against Wingnuts and Crowley as well as its order transferring title to the Mooney and remand to the superior court for further proceedings.
E. The Superior Court Must Explain The Basis For The Judgment Against Crowley Individually.
Crowley contends that the judgment entered against him as an individual should not stand because the Mooney-secured loan was an obligation of Wingnuts, an LLC, and NA Holdings offered no evidence or argument to support piercing the corporate veil. NA Holdings contends that the judgment against Crowley as an individual was based on his status as a guarantor of the Mooney-secured loan.
The superior court did not explain why it entered judgment against Crowley "in his individual capacity" for the Mooney-secured loan - it merely stated it would do so in a footnote. Because we are presented with conflicting legal theories and no way to determine the basis for the superior court's decision, we vacate the judgment against Crowley in his individual capacity and remand this issue to the superior court.
V. CONCLUSION
We AFFIRM the superior court's finding that failure to give Knik Aircraft Leasing notice of default prior to repossession of the Cessnas was harmless; we also AFFIRM the superior court's interpretation of the text messages between Helmericks and Crowley. We REVERSE the superior court's decision that Northern Aviation's failure to provide notice of disposition of the Cessnas was harmless. We VACATE the superior court's decisions about the repossession of the Mooney, its entry of judgment on the Mooney-secured loan, and its entry of judgment against Crowley in his individual capacity. We REMAND this case to the superior court for further proceedings consistent with this opinion.

No one questioned in the trial court or on appeal this unorthodox use of Rule 14, so we do not discuss the appropriateness of the procedure.

See Alaska R. Civ. P. 14(a) (stating that a third-party plaintiff "may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff").

Knik's status during the pendency of the case was unclear given that it was never summoned or served with a copy of the complaint. The attorney representing Crowley and Wingnuts indicated that he was submitting written closing and rebuttal statements on behalf of Knik, although the signature blocks on these pleadings do not reflect his representation, and he never formally entered an appearance. Northern offered no objection in the trial court to Crowley's attorney arguing on behalf of Knik, although it phrased its rebuttal as though Crowley as an individual, rather than Knik, had made the arguments.

See Alaska R. Civ. P. 13(a)-(c) (distinguishing compulsory and permissive counterclaims and allowing counterclaims different in kind or amount from original claim).

See Alaska R. Civ. P. 13(g) (allowing cross-claim against a co-party that arises out of same transaction that is subject of original action or counterclaim).

See Alaska R. Civ. P. 13(h) (allowing joinder of other parties under Alaska Rules of Civil Procedure 19 and 20 ).

Alaska R. Civ. P. 88(d).

This calculation was based on Crowley's interpretation of the agreement's prepayment clause. Crowley testified that he understood the prepayment clause to allow him to make a large payment at times when he had a lot of income, such as the summer, so that he would not need to worry about making the minimum payments when he had little income. Helmericks had a different interpretation, indicating that NA Holdings applied any amount paid over the minimum payment to the principal balance but required a minimum payment every month.

A provision stated that "[a]ny notice required to be given under this Agreement" was to be in writing.

Stanton v. Fuchs , 660 P.2d 1197, 1198 (Alaska 1983).

Sullivan v. Subramanian , 2 P.3d 66, 69 (Alaska 2000).

See, e.g. , Ilardi v. Parker , 914 P.2d 888, 892-93 (Alaska 1996) (remanding for further findings).

State v. Jeffery , 170 P.3d 226, 229 (Alaska 2007).

The superior court order on which Northern relies dealt only with Crowley's standing as an individual to bring an affirmative lawsuit for breach of contract against Northern. The trial court did not explicitly decide whether Crowley could, as a member of Knik or as a guarantor, raise arguments on behalf of Knik in defending against Northern's third-party lawsuit.

See supra notes 2 and 3 and accompanying text.

Crowley's claim that notice was required appears to be based on our precedent about waiver, but his argument does not clearly articulate why prerepossession notice was required here. Two of our prior cases have discussed notice in the repossession context when waiver is alleged. See Alaska Statebank v. Fairco , 674 P.2d 288, 292-93 (Alaska 1983) (affirming trial court decision that pre-repossession notice was necessary when creditor's conduct and oral statements modified contract); Kupka v. Morey , 541 P.2d 740, 746 (Alaska 1975) (holding that creditor could not base default on failure to insure airplane when creditor had obtained insurance pursuant to one contract provision but failed to inform debtor of insurance cancellation).

See AS 45.29.609 (allowing secured party to take possession of collateral after default).

AS 45.29.101 -.811.

See AS 45.29.611 -.614.

Northern brought its claim as a breach of contract action, but by retaining the Cessnas and disposing of at least one without litigation, Northern availed itself of secured creditors' statutory remedies. AS 45.29.609 -.610. The security agreement gave Northern "the remedies of a Secured Party under the law" and contains a provision that the agreement is to be construed in accordance with Alaska law. Alaska Statutes 45.29.101 -.811 govern secured transactions in Alaska and apply to this case.

Rules for notice in consumer transactions are found in AS 45.29.614.

AS 45.29.610, .615.

AS 45.29.611(b) -(c). As a guarantor under the security agreement, Crowley may have had the status of a secondary obligor. See AS 45.29.102(a)(90). Not all guarantors are secondary obligors. See U.C.C. § 9-102(a)(71) & cmt. 2(a), 3 U.L.A. 62, 65-66 (2010) (explaining addition of "secondary obligor" to revised Article 9). But secondary obligors have specific rights under AS 45.29, including some rights to notice, see AS 45.29.611(b) -(c), as well as the ability to raise defenses in an action related to a deficiency, see AS 45.29.626.

AS 45.29.615.

Hoch v. Ellis , 627 P.2d 1060, 1062-63 (Alaska 1981) ; see also Dischner v. United Bank Alaska , 631 P.2d 107, 110 (Alaska 1981) (holding that presumption that actual value of collateral is equal to amount of outstanding debt may be rebutted by clear and convincing evidence).

See AS 45.29.626 (setting out burdens of proof in actions where deficiency or surplus is in issue).

As we observed earlier, the complaint fails to set out explicitly a cause of action against Crowley as an individual. See supra p. ----.

See supra note 23.

See supra notes 2 and 3.

A sale is not the only way a creditor can dispose of collateral. See AS 45.29.610(a) (permitting secured party to "sell, lease, license, or otherwise dispose" of collateral after default).

Cf. Kobuk Eng'g & Contracting Servs., Inc. v. Superior Tank & Constr. Co.Alaska , 568 P.2d 1007, 1011-12 (Alaska 1977) (holding that creditor's sale of equipment to itself with little notice and for substantially less than it obtained weeks later from another buyer was not commercially reasonable).

AS 45.29.623.

We reject Crowley's argument that the superior court erred as a matter of law in its analysis. The superior court's discussion suggests that it was attempting to discern Crowley's allocation instructions from an ambiguous text. Given the lack of clarity, the superior court reasonably evaluated the parties' credibility to determine the text messages' meaning.

We have not been called upon to clarify what constitutes a breach of the peace under AS 45.29.609(b) ; "breach of the peace" was left undefined by the U.C.C.'s drafters, "leaving that matter for continuing development by the courts." U.C.C. § 9-609 & cmt. 3, 3 U.L.A. 671-72 (2010). As Wingnuts and Crowley assert, there is considerable case law on this subject from other jurisdictions, and it is not uniform.

See Madden v. Deere Credit Servs., Inc. , 598 So. 2d 860, 866 (Ala. 1992) ("The creditor's privilege is most severely restricted when repossession can be accomplished only by the actual breaking or destruction of barriers designed to exclude intruders.").